**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

STEVEN CRAIG MORELAND,
            *Defendant-Appellant.*

No. 05-30541

D.C. No.
CR-01-00108-05-
BJR

ORDERS AND
OPINION

On Remand from the United States Supreme Court

Filed September 17, 2010

Before: Procter Hug, Jr., M. Margaret McKeown, and
William Fletcher, Circuit Judges.

Orders;
Opinion by Judge Hug

14287

**COUNSEL**

Jordan Gross, Yarmuth Wilsdon Calfo PLLC, Seattle, Washington, for the defendant-appellant.

Andrew C. Friedman and Carl Blackstone, Assistant United States Attorneys, Seattle, Washington, for the plaintiff-appellee.

_____

## ORDER

The Opinion filed on May 3, 2010, and appearing at 604 F.3d 1058 (9th Cir. 2010), is withdrawn. It may not be cited as a precedent by or to this court or any district court of the Ninth Circuit.

The petition for rehearing is DENIED. A new opinion is filed concurrently with this order.

_____

## ORDER

This case comes on remand from the Supreme Court of the United States, which vacated this court's December 12, 2007, judgment, *United States v. Moreland*, 509 F.3d 1201 (9th Cir. 2007), in light of the Supreme Court's decision in *United States v. Santos*, 128 S. Ct. 2020 (2008). In the present opinion, we reinstate Parts I and II.A-D of our former opinion and revise the remainder in light of *Santos* and other developments in the law.

We also DENY defendant-appellant Steven Moreland's Contingent Motion for Stay Pending United Supreme Court's Resolution of *United States v. Dolan*, 571 F.3d 1022 (10th Cir. 2009), *cert. granted*, 78 U.S.L.W. 3391 (U.S. Jan. 8, 2010) (No. 09-367). Moreland may raise the effect of the upcoming decision in *Dolan* on remand.

_____

**OPINION**

HUG, Circuit Judge:

For his participation in a fraudulent pyramid scheme, defendant-appellant Steven Moreland was convicted of mail and wire fraud, money laundering, and conspiracy to commit mail and wire fraud and money laundering. On remand, the district court imposed a revised sentence of 18 years in prison and ordered Moreland to pay restitution to the victims in the amount of slightly over $36 million. Moreland appeals his conviction on the grounds that he involuntarily waived his right to counsel and received ineffective assistance of counsel, the district court erred in not granting an adequate continuance, the prosecution committed misconduct resulting in a violation of his due process rights, and insufficiency of the evidence. Finally, Moreland appeals the imposition of restitution because the district court failed to comply with the time frame outlined in § 3664(d)(5) of the Mandatory Victims Restitution Act.

I.

Moreland participated in an enormous pyramid scheme that, from November 1997 until May 2000, swindled approximately 2,500 people out of more than $73 million. Many of the victims in this case were of retirement age and invested much or all of their savings in the scheme, which promised astronomical returns. In reality, Moreland and his associates were conducting a massive fraud in which a portion of the funds from later investors were used to pay the promised returns of some earlier investors. Most earlier investors were convinced to roll their fictional returns over into supposed new investment opportunities. The funds not used to repay earlier investors were paid to the operators of the scheme or squandered on unsound financial misadventures.

The federal government finally shut down the scheme on May 10, 2000, by executing search warrants at the home of

John Wayne Zidar, the mastermind and leader of the scheme, and the business offices in Washington and Arizona from which the scheme was conducted. On the day of the searches, Moreland fled with his family to Costa Rica, where he planned to stay in order to avoid capture. Although his wife refused to stay in Costa Rica, necessitating his return to the United States, Moreland went back to Costa Rica in August 2000. He took with him all of his documents relating to the scheme in order to prevent the government from obtaining the records. After supposedly discovering the fraudulent nature of the enterprise for the first time while in Costa Rica, Moreland continued transferring money from accounts containing victims' investment funds into his own accounts to pay his salary and personal expenses.

Moreland and his associates were indicted on March 28, 2001. Moreland eventually surrendered on April 3, 2001, in Tyler, Texas, at which time he was arrested. While driving from Dallas to Tyler to surrender, Moreland stopped about half way between in the town of Canton and discarded his laptop computer in a dumpster behind a Dairy Queen near the highway.

At his initial appearance in the Western District of Washington on April 20, 2001, Moreland indicated his desire to represent himself. Upon the prosecution's motion, a magistrate judge conducted a hearing pursuant to *Faretta v. California*, 422 U.S. 806 (1975), on April 26 to determine whether Moreland should be permitted to waive his right to counsel. The magistrate judge permitted Moreland to represent himself but concluded that standby counsel should assist him. Ralph Hurvitz was then appointed to facilitate Moreland's defense. The district judge conducted a second *Faretta* hearing on June 5, at the request of the prosecution, at which time she urged Moreland not to represent himself. Nonetheless, the district judge concluded that Moreland had knowingly and intelligently waived his right to counsel and permitted him to con-

tinue representing himself. The district judge further directed Hurvitz to continue acting as standby counsel.

In a second superceding indictment issued on January 8, 2002, Moreland was charged with ten counts of mail fraud in violation of 18 U.S.C. § 1341, six counts of wire fraud in violation of 18 U.S.C. § 1343, four counts of promotion money laundering in violation of 18 U.S.C. § 1956(a)(1), four counts of concealment money laundering involving foreign transfers in violation of 18 U.S.C. § 1956(a)(2), conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 371, and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). The second superceding indictment also contained a criminal forfeiture count relating to numerous items of both real and personal property in the possession of the defendants as well as funds seized from bank accounts in the United States, Samoa, Costa Rica, and the Bahamas.

On April 23, 2002, Moreland filed a motion to have a lawyer appointed to represent him. The district court held a hearing on the motion on May 6, 2002, and Hurvitz was appointed to represent him because of his familiarity with the case. The trial was set for June 10, 2002. Hurvitz stated that he wanted additional time to prepare, but Moreland opposed a continuance. The district court granted a continuance of two weeks until June 24, 2002. Hurvitz served as Moreland's counsel during the trial.

On August 14, 2002, after a 34-day trial, a jury found Moreland guilty on three counts of mail fraud, three counts of wire fraud, two counts of promotion money laundering, four counts of concealment money laundering involving foreign transfers, and both conspiracy charges. Zidar was also found guilty on all 25 counts on which he was charged and sentenced to 30 years in prison. *United States v. Zidar*, 178 Fed. Appx. 673, *1 (9th Cir. 2006)

In determining Moreland's sentence, the district court adopted the Sentencing Guidelines calculation set forth in the original Presentence Report. Accordingly, the district court began with a base offense level of 43 and criminal history category I, which resulted in a sentence range of life imprisonment. The district court departed downward three points due to Moreland's mental state, resulting in a base offense level of 40 and a criminal history category of I. The applicable sentence range, under the 1998 edition[1] of the U.S. Sentencing Commission Guidelines Manual, was 292-365 months in prison. The district court sentenced Moreland to 292 months in prison, the bottom of the sentencing range, on August 22, 2003. At the prosecution's request, the district court also deferred the issue of restitution pending a determination by a receiver in a related civil case, brought by the U.S. Securities and Exchange Commission, of the identities of victims and the amounts of their losses. The district court's order explicitly stated that it would "enter a subsequent order identifying the payees and the amount of restitution owed to each payee." Moreland did not object to the district court's deferral of the restitution determination.

Moreland then appealed his conviction and sentence, but not the district court's deferral of restitution, to this court. Following the Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296 (2004), a prior panel of this court remanded for resentencing under the now-advisory Sentencing Guidelines on December 14, 2004. The remand order did not address the substantive issues raised in Moreland's appeal.

On remand, the district court ordered the preparation of a Revised Presentence Report. In March 2005, while the Revised Presentence Report was being prepared, the receiver completed its task of identifying victims and the amounts of their losses. The government then submitted its Revised Pre-

---

[1]The 1998 edition was used to avoid a possible violation of the *ex post facto* clause.

sentence Report on November 1, 2005. The Revised Presentence Report, which contained the list of victims and losses, recommended that the district court adopt the same Sentencing Guidelines calculation as in the original sentence and order restitution in the amount of $36,031,772.84 pursuant to 18 U.S.C. § 3663A.

The district court held a sentencing hearing on November 7, 2005, at which time the district court adopted the Sentencing Guidelines range recommended in the Revised Presentence Report and found by clear and convincing evidence the factors on which the recommendation was based. In light of *United States v. Booker*, 543 U.S. 220 (2005), the district court examined the sentencing factors listed in 18 U.S.C. § 3553(a) and reduced Moreland's sentence to 216 months (18 years) in prison. The district court also imposed $36,031,772.84 in restitution. Moreland appealed his conviction as well as the revised sentence and restitution order on November 10, 2005.

## II.

Moreland appeals his conviction by alleging denial of his right to counsel, ineffective assistance of counsel, improper failure of the district court to grant a continuance, prosecutorial misconduct, and insufficiency of the evidence.

### A.

[1] First, Moreland argues that he involuntarily waived his right to counsel. The Sixth Amendment of the U.S. Constitution guarantees that a person brought to trial in federal court "must be afforded the right to the assistance of counsel before he can be validly convicted and punished by imprisonment." *Faretta*, 422 U.S. at 807. A criminal defendant may waive the right to counsel and represent himself. *Id.* at 819-20. When a defendant requests to proceed pro se, a district court may only grant the request after determining that the defendant "know-

ingly and intelligently" waived the right to counsel. *Id.* at 835. Once a district court has determined that a defendant's waiver of his right to counsel is knowing and intelligent, it may appoint standby or "advisory" counsel to assist the pro se defendant without infringing on his right to self-representation. *McKaskle v. Wiggins*, 465 U.S. 168, 176-77 (1984). At the same time, a defendant who waives his right to counsel does not have a right to advisory counsel. *United States v. Salemo*, 81 F.3d 1453, 1460 (9th Cir. 1996); *United States v. Kienenberger*, 13 F.3d 1354, 1356 (9th Cir. 1994). Generally, the role of standby counsel is vague and undefined, and the defendant must retain control over his case. *McKaskle*, 465 U.S. at 177-78.

The district court conducted two separate Faretta hearings in this case and, after each hearing, concluded that Moreland's requested waiver was both knowing and intelligent. The district court also appointed standby counsel to assist Moreland. Moreland argues on appeal, however, that his waiver of his right to counsel was conditioned on assurances from the district court regarding the level of assistance he could expect to receive from standby counsel. Those assurances were not satisfied, according to Moreland, because standby counsel did not provide as much assistance as Moreland expected. For that reason, Moreland argues that his waiver of his right to counsel was not voluntary.[2]

---

[2]Moreland relies on *Milton v. Morris*, 767 F.2d 1443 (9th Cir. 1985), for the proposition that a defendant who waives his right to counsel based on an understanding that he will have assistance with his pro se defense has not knowingly and intelligently waived his right to counsel under Faretta. The two cases are not similar. In *Milton*, the district court and prison officials blocked the defendant's access to legal materials, telephone use, investigators, couriers, and witness. *Id.* at 1444-45. Here, Moreland had more than ample access to the means necessary to prepare his defense. Moreover, Moreland received assistance from standby counsel, just not the degree of assistance he later decided he wanted. Additionally, the district court repeatedly advised Moreland to withdraw his waiver and request representation, but he refused to do so. When Moreland eventually did withdraw his waiver, the district court appointed counsel.

The validity of a Faretta waiver is a mixed question of law and fact reviewed de novo. *United States v. Erskine*, 355 F.3d 1161, 1166 (9th Cir. 2004).

**[2]** The record undermines Moreland's assertion that his waiver was conditioned on specific assurances from the district court regarding the level of participation he could expect from standby counsel. During the second *Faretta* hearing, which the prosecution requested after learning that Moreland was receiving assistance with his case from Donald Mueller, a former co-participant in the pyramid scheme who was not licensed to practice law and who was scheduled to appear as a witness on Moreland's behalf, the district judge engaged in a lengthy discussion with Moreland, ensuring that he understood the charges against him and the disadvantages of representing himself. Indeed, the district judge "strongly urge[d]" Moreland to obtain counsel. Nevertheless, Moreland insisted on representing himself. The district judge concluded that his waiver was voluntary and directed Hurvitz to continue serving as standby counsel. In continuing Hurvitz's participation as standby counsel, the district judge did not promise any specific degree of assistance. Rather, the district judge explicitly noted that the role of standby counsel was undefined. As the district judge explained: "So his position in this case to a large extent is determined by your position in the case. . . . It's hard to tell now what's going to happen. Cases develop often with a life of their own. . . . But what his role is to a large extent will be determined on how you use him." The district judge went on to make clear that Moreland and Hurvitz would have to "play this by ear." That explanation of the role of standby counsel was not specific. Thus, contrary to Moreland's contention, the district court made no assurances upon which he could have reasonably conditioned his waiver of counsel.

Furthermore, if Moreland did not believe that standby counsel was living up to his expectations, he had ample opportunity to waive his right to self-representation and request the district court to appoint full counsel. In fact, after

the second Faretta hearing, Moreland began complaining about Hurvitz's representation almost immediately. Among other things, Moreland accused Hurvitz of refusing to familiarize himself with the case, review the evidence, assist with discovery, and "offer any assistance beyond filing a few motions." In September 2001, Moreland requested to have Hurvitz replaced by "non-representational counsel"—that is, Mueller. The district judge denied Moreland's request, stating that although the role of standby counsel is "vague and undefined, the court instructed Hurvitz to fill that role as appropriately as possible under the circumstances." The district judge further stated that "it was the court's understanding during the *Faretta* hearing that Moreland expected little more from Hurvitz than fulfillment of basic administrative responsibilities." The district judge further explained that "based on representations from Moreland that he wishes to represent himself, Hurvitz is prohibited from contributing beyond a basic level to Moreland's case, for risk of encroaching on Moreland's *Faretta* rights." The district court went on to state that "Moreland is requesting, and Hurvitz is resisting, more participation than courts creating the standby counsel role anticipated." Consequently, the district court clearly informed Moreland well in advance of trial what he could and could not expect from standby counsel. If Moreland's waiver of his right to counsel was truly conditioned on his expectation that Hurvitz would play a larger role in his defense, he could have withdrawn his waiver and asked the district court to appoint full counsel at that time. He did not do so.

Instead of waiving his right to self-representation, Moreland filed additional pleadings in October and December 2001, in which he suggested that the district court was unlawfully preventing Mueller from representing him. The district court again admonished Moreland that Mueller would not be permitted to represent him. The district court also informed Moreland that, unless he was willing to allow Hurvitz to represent him, he was not entitled to greater assistance than Hurvitz was already providing. Again, Moreland declined to

waive his right to self-representation and have full counsel appointed. Despite Moreland's ostensible disappointment with Hurvitz's performance as standby counsel, Moreland did not withdraw his waiver and request that counsel be appointed to represent him until April 23, 2002.

**[3]** At no point did the district court lead Moreland to believe that he would receive substantial assistance with his case from standby counsel. Thus, Moreland's waiver of his right to counsel was knowing and intelligent.

B.

**[4]** Second, Moreland claims that he was denied effective assistance of counsel. "[A]s a general rule, we do not review challenges to the effectiveness of defense counsel on direct appeal." *United States v. Jeronimo*, 398 F.3d 1149, 1155 (9th Cir. 2005). Rather, we prefer to review ineffective assistance of counsel claims in habeas corpus proceedings under 28 U.S.C. § 2255. *United States v. Alferahin*, 433 F.3d 1148, 1160 n.6 (9th Cir. 2006). We may consider such claims on direct appeal, however, where "the record on appeal is sufficiently developed to permit determination of the issue." *Id.*

**[5]** In this appeal, Moreland makes four arguments in support of his ineffective-assistance-of-counsel claim: (1) trial counsel failed to investigate Moreland's mental health, (2) trial counsel failed to request an adequate continuance, (3) trial counsel failed to object to the district court's limitation of Moreland's direct examination, and (4) trial counsel failed to object to questions regarding the veracity of witnesses on cross-examination and to the prosecution's statements during closing arguments regarding Moreland's veracity. But the record is not sufficiently developed to permit determination of the issues. For example, defense counsel has not had an opportunity to explain his actions. *See United States v. Laughlin*, 933 F.2d 786, 789 (9th Cir. 1991). The record is also undeveloped with regard to Moreland's purported mental

health defense, as the government has not conducted its own psychological evaluation. Without that evaluation, we are unable to determine whether prejudice resulted from trial counsel's failure to investigate. *Id.* Accordingly, we decline to consider Moreland's ineffective assistance of counsel claims on direct appeal, but he may pursue those claims in collateral proceedings. *Jeronimo*, 398 F.3d at 1156.

## C.

Third, Moreland contends that the district court erred in failing to grant an adequate continuance. Here, the district court granted a two-week continuance over Moreland's objection. But Moreland argues that the district court should have sua sponte granted a lengthier continuance to allow his trial counsel adequate time to prepare. A district court's decision to grant or deny a continuance is reviewed for abuse of discretion, even where a defendant fails to make a formal motion for a continuance. *United States v. Nguyen*, 262 F.3d 998, 1002 (9th Cir. 2001). There is no abuse of discretion unless the denial was "arbitrary or unreasonable." *United States v. Wills*, 88 F.3d 704, 711 (9th Cir. 1996).

**[6]** The district court did not abuse its discretion in granting only a two-week continuance, however, because the need for a continuance was Moreland's fault. *See United States v. Fowlie*, 24 F.3d 1059, 1069 (9th Cir. 1994). The district court repeatedly advised Moreland to withdraw his waiver of counsel and accept representation. For example, the district judge told Moreland "[i]f you exclude Mr. Hurvitz early on, then turn to him later, he's going to be severely handicapped, in ways he wouldn't be if he were your attorney right from the beginning." But Moreland insisted on relying on Mueller, a co-participant in the criminal enterprise and an unlicensed lawyer, as legal counsel. Moreland did not request representation until two months before trial. When Moreland finally did accept counsel, he opposed his trial counsel's expressed desire for a continuance and prevented trial counsel from

requesting more time to prepare. He even opposed the two-week continuance granted sua sponte by the district court. Consequently, Moreland was clearly to blame both for the delay and for the district court not granting a longer continuance. The district court's decision to grant only a two-week continuance, when Moreland objected to any continuance, was not "arbitrary or unreasonable"; therefore, the district court did not abuse its discretion.

### D.

Fourth, Moreland argues that his due process rights were violated because the government committed prosecutorial misconduct by questioning Moreland about the veracity of two prosecution witnesses during cross-examination and by casting doubt upon Moreland's veracity during closing arguments. Moreland did not object at trial. "We review claims of prosecutorial misconduct for plain error when a defendant failed to object at trial." *United States v. Washington*, 462 F.3d 1124, 1136 (9th Cir. 2006); *see* Fed. R. Crim. P. 52(b). Under the plain error standard, relief is not warranted unless there has been: (1) "error," (2) that was "plain," (3) that affected "substantial rights," and (4) that "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Recio*, 371 F.3d 1093, 1100 (9th Cir. 2004).

### 1.

**[7]** Moreland first asserts that his due process rights were violated when the prosecution asked him to testify regarding whether two government witnesses lied during their testimony. It is improper for a prosecutor to question a defendant regarding the veracity of a government witness. *United States v. Combs*, 379 F.3d 564, 572 (9th Cir. 2004); *see also United States v. Sanchez-Lima*, 161 F.3d 545, 548 (9th Cir. 1998) (holding that testimony regarding witness' credibility is prohibited unless it is admissible as character evidence). In this

case, the prosecutor twice asked Moreland about the veracity of government witnesses during his cross-examination. The first instance involved Juan Alvarez, a Costa Rican attorney with whom Moreland left all of his documentation regarding the criminal enterprise. Alvarez testified that he never had an attorney-client relationship with Moreland, whereas Moreland claimed Alvarez was his lawyer. The prosecutor asked Moreland to testify regarding Alvarez's veracity on this point:

Q. You're telling us he was your lawyer?

A. Yes, he was.

Q. You heard his testimony. He said he had no client relationship with you.

A. That was his testimony.

Q. He's lying?

A. I don't know why he would be, but he has to be.

Q. So he's a liar. Right?

A. I don't know why, but yes.

The second instance involved Lisa Green, a former administrative assistant who testified about statements Moreland made concerning the ownership of a house in Texas and whether Moreland paid his personal expenses with money from a trust set up with investor funds. She also testified that Moreland had lied to investors about his health. The prosecution's questioning of Moreland transpired as follows:

Q. Lisa Green told us you had that checkbook in your house?

A. Yes, sir, she did.

Q.   And she told us that you would sign Jeff Lewis and Derral Hineman's names to those checks. Remember her testimony?

A.   That's what her testimony was. That is not true.

Q.   She's lying?

A.   I just was never allowed to sign their signatures. There was no reason to.

Q.   When she told this jury she saw you signing Jeff Lewis's name, she's lying. Right, Mr. Moreland?

A.   No. I think she could have been mistaken. . . .

                    . . .

Q.   You told Ms. Green that this house was your house, didn't you?

A.   No, sir, I did not.

Q.   So she's lying about that?

A.   You know, people jump to conclusions . . . .

Q.   If Ms. Green said you told her this was your house, was she lying about that?

A.   Yes, sir, she would be. I've never had a discussion with her like that.

Q.   Why do you think she would come in here and lie under oath about you?

A.   Well, probably because I fired her.

. . .

> Q.  So if [Ms. Green] said you were healthy, she's
> lying.
>
> A.  You're trying to twist something here of what
> is this sabbatical.

The prosecutor's questioning is clearly improper under our case law. In *United States v. Geston*, 299 F.3d 1130 (9th Cir. 2002), a case involving the prosecution of a police officer for unreasonable use of force, we held that a prosecutor's questioning of two law enforcement officers during cross-examination improperly compelled the witnesses to offer opinions regarding the veracity of government witnesses. *Id.* at 1136-37. When cross-examining two defense witnesses, the prosecution in *Geston* summarized prior government witness testimony that contradicted each defense witness's testimony, and then asked whether the defense witness thought the government witness was lying. *Id.* at 1135-36. We held this type of questioning to be improper. *Id.* at 1136. Similarly, in *Combs*, we found that the prosecution improperly questioned the defendant regarding whether a government agent lied during his testimony. 379 F.3d at 572. The questioning in this case also resembles the questioning in *United States v. Sanchez*, 176 F.3d 1214 (9th Cir. 1999), in which we held that compelling a defendant to call a government agent a liar was improper. *Id.* at 1220. The following constituted the line of questioning deemed improper in *Sanchez*:

> Q.  You heard Deputy Marshal Fielder testify this
> morning?
>
> A.  Yes, I did.
>
> Q.  You were telling the ladies and gentlemen of
> the Jury that he lied to them?

A.   Yes, I did.

Q.   That is what you are saying, he lied this morn-
     ing?

*Id.* at 1219. The questioning in this case is not only similar in
nature to that in *Sanchez*, it is lengthier and more accusatory.
Therefore, the prosecutor's cross-examination of Moreland
was improper.

The government argues, however, that the prosecutor's
questions regarding Green and Alvarez were proper because
Moreland "invited" questions regarding their veracity.
According to the government, Moreland opened the door to
the issue of Green's credibility by stating "That's what her
testimony was. That is not true." The government seems to
suggest that the prosecution had no choice but to follow up
Moreland's statement by asking whether Green was lying.[3]
This argument makes little sense on its own, especially when
compared to the questioning in *Sanchez*, and becomes com-
pletely invalid when considering the entire line of question-
ing. The prosecutor asked whether Moreland considered
Green a liar six times. Moreland tried to explain that Green
was not a liar four times, but the prosecutor persisted with
questions regarding her veracity. Consequently, the govern-
ment cannot plausibly claim that its questions about Green's
truthfulness were "invited."

[8] Even though the prosecution's questioning was
improper, it does not amount to plain error. "A prosecutor's
improper questioning is not in and of itself sufficient to war-
rant reversal. It must also be determined whether the prosecu-
tor's actions 'seriously affected the fairness, integrity, or
public reputation of judicial proceedings, or where failing to
reverse a conviction would result in a miscarriage of jus-

---

[3]The government offers no specific rationale to support its argument
that Moreland "invited" testimony regarding Alvarez's veracity.

tice.' " *Geston*, 299 F.3d at 1136 (quoting *United States v. Tanh Huu Lam*, 251 F.3d 852, 862 (9th Cir. 2001) (citation omitted), and citing *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998)). Moreland argues that the prosecutor's questions prejudiced his defense and affected the integrity of his trial because Moreland's knowledge and intent were the main issues at trial and credibility of the witnesses was central to the prosecution's case. As the government points out, the prosecution presented more than 75 witnesses in this case. Furthermore, Green and Alvarez were peripheral witnesses because they testified regarding matters of minor importance to the case. In fact, Moreland himself admits that an IRS agent was the prosecution's key witness. In the context of this long and complicated trial, in which witness credibility was not paramount, the prosecution's questioning of Moreland regarding those two non-essential witnesses did not prejudice his defense, affect his substantial rights, or diminish the integrity of the judicial proceedings.

2.

**[9]** Moreland next argues that his due process rights were violated by the prosecution's statements during closing arguments regarding Moreland's veracity. As a general rule, "a prosecutor may not express his opinion of the defendant's guilt or his belief in the credibility of [government] witnesses." *United States v. McKoy*, 771 F.2d 1207, 1211 (9th Cir. 1985). This concept has been extended to find that referring to a defendant as "a liar" during closing argument, when that assertion is not based on "reasonable inferences," is improper. *See United States v. Garcia-Guizar*, 160 F.3d 511, 520 (9th Cir. 1998). At the same time, we have recognized that "the prosecution must have reasonable latitude to fashion closing arguments." *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991). As a result, it is "neither unusual nor improper for a prosecutor to voice doubt about the veracity of a defendant who has taken the stand." *United States v. Birges*, 723 F.2d 666, 672 (9th Cir. 1984). Indeed, we have found

that, in "instances of flatly contradictory testimony on impor-
tant issues . . . it [is] proper for the government to argue that
the jury ought not to believe the [defendant's] version."
*Molina*, 934 F.2d at 1445. Thus, the prosecution may refer to
a defendant as a liar if it is "commenting on the evidence and
asking the jury to draw reasonable inferences." *Garcia-
Guizar*, 160 F.3d at 520; *see also United States v. Rude*, 88
F.3d 1538, 1548 (9th Cir. 1996) (holding that a prosecutor's
use of the words "lie," "lies," or "lied" over 90 times when
referring to the defendants in its closing argument was
"within the boundaries of proper . . . summations.").

In this case, the prosecutor referred to Moreland as a liar
several times throughout his closing argument. To illustrate,
Moreland points to the following statement:

> Remember, I asked Mr. Moreland about [being a
> liar] on the witness stand. I said: Hey, if this jury
> finds that you lied, can they apply your own words
> to yourself and conclude that as to you, once a liar
> always a liar? And you saw the little cogs in his head
> spin. He didn't know quite what to say. He was in
> kind of a jam there. He paused, he delayed, and he
> finally begrudgingly said: Yeah, they can conclude
> once a liar, always a liar. Make Mr. Moreland eat
> those words. And you can find so many lies he told.
> I'll tell you some of them. But when you go back in
> there, you can probably make a list of 50 lies he told.
>
> . . .
>
> So once you conclude Mr. Moreland is a liar, then
> nothing he told you is believable.

The prosecutor then went on to point out specific examples of
contradictory testimony pointing to the conclusion that More-
land was not telling the truth. For example, the prosecutor
specifically discussed Moreland's explanation of the invest-

ment scheme and how Moreland merged his enterprise with scheme mastermind Zidar's, Moreland's denial that the house he lived in was actually his, Moreland's denial that he threw his laptop into a dumpster, and whether Moreland knew of the government's search of Zidar's house when he fled to Costa Rica. The prosecution then went on to remind the jurors that it was their job to evaluate the credibility of the witnesses and defendants.

**[10]** This case is similar to *Molina*, in which the prosecutor explained how the defendant's testimony directly conflicted with that of a confidential informant and then stated that the defendant must have lied. 934 F.2d at 1445. In *Molina*, the defendant objected to the following passage from the prosecution's closing argument:

> [Y]ou could only come to one conclusion: That somebody is lying. And who is that? Who's lying? *Is Special Agent Reyes lying?* Did he get up on the stand under oath and lie to you for the sole purpose of convicting an innocent man? *It's unbelievable.*
>
> *The one who lied to you is the one who is guilty* of possessing with the intent to distribute the cocaine. *And that's the defendant, Frank Molina.* And when you weigh the credibility of the witnesses, remember that there was one witness here who had a greater motive to lie than any other witness, a greater stake in this case than either Art Reyes or Alvaro or Agent Leppla or anybody, and that man was the defendant, Frank Molina. He had the greatest bias in this case and the greatest motive to lie.
>
> So when you go back into the jury room remember . . . that *Mr. Molina lied to you on the stand and remember that the reason he lied to you is because he is guilty*, and that's the only reason and the only motivation for him to lie.

*Id.* (alterations in original) (emphasis in original). We found that "the inference is unavoidable that 'somebody is lying' " and that the prosecutor's statements were proper based on the evidence. *Id.* Similarly, the prosecutor's statements in this case were reasonable based on the evidence, which the prosecutor demonstrated by carefully walking the jury through the evidence and pointing out inconsistencies. Therefore, based on the case law, the prosecutor's statements regarding Moreland's credibility were not improper.

Moreover, the prosecutor's statement did not affect Moreland's substantial rights. Even if the prosecutor's statements were improper, Moreland must show that the statements affected the outcome of his trial. *United Stated v. Romero-Avila*, 210 F.3d 1017, 1022 (9th Cir. 2000). Where the government "presented strong independent evidence of [the defendant's] guilt," a prosecutor's improper statements about the defendant during cross-examination will not be found to have affected the defendant's substantial rights. *Id.* at 1023; *see also United States v. Laurins*, 857 F.2d 529, 539 (9th Cir. 1988) ("If the evidence was so strong that these remarks had no effect on the jury, reversal is not required."). Here, the government presented strong independent evidence that Moreland knowingly engaged in a massive fraud. Additionally, the district court properly instructed the jury that "[a]rguments and statements by lawyers are not evidence" and what the lawyers said "in their closing arguments . . . is not evidence." As a result, Moreland has not shown that the prosecutor's statements during closing arguments affected the outcome of the proceedings. *See Sassounian v. Roe*, 230 F.3d 1097, 1106-07 (9th Cir. 2000).

**[11]** Moreland also objects to what he considers the prosecutor's misstatement of the law in its closing argument. Obviously, a "prosecutor should not misstate the law in closing argument." *United States v. Berry*, 627 F.2d 193, 200 (9th Cir. 1980). Moreland argues that the following statement by the

prosecutor to the jury constituted a misstatement of the law governing the case:

> So when you're assessing credibility, look at who got up on that stand and answered questions straightforwardly, and look who tried to duck and weave. And once you conclude they're not credible, case is over.

But Moreland ignores the fact that the prosecutor spent a substantial amount of time reviewing the legal elements of the charges and discussing which facts the jury needed to find in order to convict Moreland. In doing so, the prosecutor accurately explained exactly what the government had to prove to find Moreland guilty. Consequently, the single, brief statement highlighted by Moreland is neither improper nor did it affect his substantial rights. "Put in proper context," the statement was an "isolated moment" in a 34-day trial. *See Hall v. Whitley*, 935 F.2d 164, 165-66 (9th Cir. 1991). Moreland's due process rights were not violated.

## III.

As noted above, on January 21, 2009, the Supreme Court vacated our December 12, 2007, judgment, *United States v. Moreland*, 509 F.3d 1201 (9th Cir. 2007), in favor of the United States and remanded for further consideration in light of *United States v. Santos*, 553 U.S. 507 (2008). After the Supreme Court's remand, we asked the parties to file supplemental briefing on the effect of *Santos* on this court's prior opinion. We now turn to *Santos* and its impact on this case.

## A.

*Santos* concerned a prosecution against two defendants for their involvement in an illegal gambling business. *See Santos*, 128 S. Ct. at 2022-23. The ringleader, Santos, employed a number of people to help him run the lottery. *Id.* at 2022.

These workers included runners, who gathered bets from gamblers and kept a portion of the bets as commissions. *Id.* Santos also employed collectors, including Diaz, who collected bets and delivered them to Santos. *Id.* Part of these bets were paid to Diaz and other collectors as a salary; Santos used other bets to pay winners. *Id.* at 2022-23.

A jury found Santos guilty of conspiracy to run an illegal gambling business, 18 U.S.C. § 371, running an illegal gambling business, § 1955, conspiracy to launder money, § 1956(a)(1)(A)(i) and § 1956(h), and promotion money laundering, § 1956(a)(1)(A)(i). *Id.* at 2023. The district court sentenced Santos to 60 months imprisonment on the two gambling counts and 210 months imprisonment on the three money laundering counts. *Id.* Diaz pleaded guilty to conspiracy to launder money and received 108 months imprisonment. *Id.*

After the defendants sought post-conviction relief under 28 U.S.C. § 2255, a district court vacated the defendants' money-laundering convictions, and the Seventh Circuit affirmed. *Id.* at 2023. Reviewing the defendants' money laundering convictions for sufficiency of the evidence, the Supreme Court considered the definition of "proceeds" as used in 18 U.S.C. § 1956(a)(1)(A)(i)[4]:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of

---

[4]In the wake of *Santos*, Congress amended the money laundering statute to define proceeds to include gross receipts of an unlawful activity. 18 U.S.C. § 1956(c)(9). Because this amendment does not apply retroactively to Moreland, we must follow *Santos*'s interpretation of the money laundering statute.

specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

**[12]** In particular, the Court considered whether proceeds may be gross receipts of a specified unlawful activity or whether proceeds must be profits. Applying the rule of lenity, a plurality held that proceeds must always be profits. *Id.* at 2025. The plurality also reasoned that applying a definition of gross receipts would result in what it called a "merger problem":

> If "proceeds" meant "receipts," nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery. Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, 18 U.S.C. § 1955, would "merge" with the money-laundering statute. Congress evidently decided that lottery operators ordinarily deserve up to 5 years of imprisonment, § 1955(a), but as a result of merger they would face an additional 20 years, § 1956(a)(1). . . .
>
> The merger problem is not limited to lottery operators. For a host of predicate crimes, merger would depend on the manner and timing of payment for the expenses associated with the commission of the crime. Few crimes are entirely free of cost, and costs are not always paid in advance. Anyone who pays for the costs of a crime with its proceeds—for example, the felon who uses the stolen money to pay for the rented getaway car—would violate the money-laundering statute. And any wealth-acquiring crime

with multiple participants would become money-laundering when the initial recipient of the wealth gives his confederates their shares. Generally speaking, any specified unlawful activity, an episode of which includes transactions which are not elements of the offense and in which a participant passes receipts on to someone else, would merge with money laundering.

*Id.* at 2026-27 (footnote omitted). Applying the profits definition of proceeds to the facts of the case, the plurality concluded that the money-laundering convictions had been properly vacated. *Id.* at 2031. They noted that the money-laundering charges against Santos were based on his payments to the lottery winners and his employees; and the money laundering charge against Diaz was based on his receipt of payments as an employee. *Id.* Neither type of transaction, the plurality stated, could fairly be characterized as involving the lottery's profits. *Id.*

Because only four justices joined the plurality's opinion,[5] Justice Stevens provided the final vote to affirm the Seventh Circuit's judgment. Justice Stevens concluded that the defendants' money-laundering convictions must be vacated but did not adopt the plurality's reasoning that proceeds must be profits in all instances. Instead, his vote was motivated by his belief that Congress could not have intended the "merger problem" produced by the defendants' convictions:

The revenue generated by a gambling business that is used to pay the essential expenses of operating that business is not "proceeds" within the meaning of the money laundering statute. As the plurality notes, there is "no explanation for why Congress would

---

[5]Justice Thomas did not join Part IV of the plurality's opinion; however, his decision not to join the entire opinion does not affect the outcome of this appeal.

have wanted a transaction that is a normal part of a crime it had duly considered and appropriately punished elsewhere in the Criminal Code, to radically increase the sentence for that crime." This conclusion dovetails with what common sense and the rule of lenity would require.

*Id.* at 2033 (Stevens, J., concurring in the judgment) (footnote and citation omitted). Thus, the plurality and Justice Stevens all agreed that proceeds means profits where viewing proceeds as receipts would present the merger problem as identified in their opinions. *See also United States v. Van Alstyne*, 584 F.3d 803, 814 (9th Cir. 2009) (identifying the holding in *Santos*).

Although *Santos* is the impetus for revisiting this case, we must also acknowledge this court's subsequent decision in *United States v. Van Alstyne*, 584 F.3d 803 (9th Cir. 2009), which refines our post-*Santos* analysis of the money laundering statute. In *Van Alstyne*, a defendant defrauded approximately 450 victims through a Ponzi scheme involving a number of companies he organized for that purpose. *Id.* at 807. The defendant, Van Alstyne, perpetuated the scheme by selling interests in oil and gas properties owned by limited partnerships that he controlled. *Id.* at 808.

Van Alstyne was convicted of seven counts of mail fraud and three counts of money laundering. *Id.* at 809. The three money laundering convictions corresponded to three specific transactions. *Id.* at 809, 815-16. The first two transactions occurred in January and June of 1994, respectively, and consisted of transfers of funds between two companies owned or controlled by Van Alstyne. *Id.* at 808-09. These transactions made distributions to individual investors. *Id.* at 809. The third transaction occurred in November 1994 and also involved a transfer of funds between companies owned or controlled by Van Alstyne. *Id.* at 808-09. However, this trans-

fer occurred after the scheme began to unravel and was made to refund one investor's entire outlay. *Id.* at 809.

On appeal, Van Alstyne argued for reversal of his three money-laundering convictions on the basis that there was insufficient evidence to support them. *Id.* at 813. Applying the *Santos* holding, this court asked "whether mail fraud is, or can be, a crime presenting the 'merger' problem that was a fulcrum consideration for the *Santos* plurality and concurrence." *Id.* at 814. In its analysis of the first two money laundering counts, this court reasoned that the distribution checks underlying those counts supposedly represented generous returns on the victims' investment and were a central component of the scheme to defraud. *Id.* at 815.

**[13]** On the other hand, the third transaction was not central to the scheme to defraud because it refunded an investor's entire outlay. *Id.* Returning the investment undermined rather than advanced the scheme because the funds were not available to lull other investors into maintaining their investment. *Id.* at 815-16. Thus, in its analysis of whether mail fraud "is, or can be, a crime presenting the 'merger' problem" presented in *Santos*, the *Van Alstyne* court distinguished between transactions that were a central component of the scheme to defraud and those that were not.

B.

We first address the effect of *Santos* and *Van Alstyne* on the adequacy of the jury instructions under which Moreland was convicted. "Any omission or misstatement of an element of an offense in the jury instructions is constitutional error and, therefore, requires reversal unless we find the error 'harmless beyond a reasonable doubt.' " *United States v. Kilbride*, 584 F.3d 1240, 1247 (9th Cir. 2009) (*quoting Chapman v. California*, 386 U.S. 18, 24 (1967)). In the absence of a timely objection to the jury instructions, however, we review for plain error. *Id.*

Moreland did not raise a timely objection to the jury instructions. Moreland did argue in a Federal Rule of Criminal Procedure Rule 29 motion that there was not "enough mens rea to show that Mr. Moreland knew that the money that was subject of the various money laundering counts under either of the charged statutes, that he knew that the funds were the proceeds of any mail fraud or wire fraud." But a Rule 29 motion challenging the sufficiency of the evidence cannot substitute as a timely objection to the jury instructions. *See United States v. Crowe*, 563 F.3d 969, 972 n.5 (9th Cir. 2009). We therefore apply plain error review. *Id.* at 972-73. "Plain error review requires us to find (1) an error that is (2) plain and (3) affects substantial rights. Even if these conditions were met, we may only exercise our discretion to correct the error if it seriously affects the fairness, integrity or public reputation of judicial proceedings." *Kilbride*, 584 F.3d at 1247 (quotation omitted).

1. Counts 26 and 27

**[14]** Moreland was convicted of promotion money laundering under Counts 26 and 27 as one who "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity . . . ." *See* 18 U.S.C. § 1956(a)(1)(A)(i). The jury instructions and indictment reflect that Counts 26 and 27 correspond to wire transfers for the purpose of paying commissions. These payments, therefore, raise the same merger problem condemned in *Santos* and *Van Alstyne*, as commissions were central to carrying out the scheme's objective of encouraging further investment. *Cf. Van Alstyne*, 584 F.3d at 815. Because the jury instructions for Counts 26 and 27 should have defined proceeds as profits, these instructions were erroneous.

**[15]** As to whether that error was plain, *Santos*'s definition of "proceeds" would not have been plain to the district court

at the time of Moreland's trial. Nevertheless, the Supreme Court has held that "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal—it is enough that an error be 'plain' at the time of appellate consideration." *Johnson v. United States*, 520 U.S. 461, 468 (1997). At the time of Moreland's trial the law in this circuit was settled that "proceeds" were "that which is obtained . . . by any transaction." *United States v. Akintobi*, 159 F.3d 401, 403 (9th Cir. 1998). After *Santos* and *Van Alstyne*, however, the law is clearly to the contrary. The district court's failure to instruct the jury that proceeds must be profits therefore constitutes an error that is plain.

We also find that the error affected Moreland's substantial rights. An error prejudices the substantial rights of a defendant when it affects the outcome of the proceedings. *United States v. Fuchs*, 218 F.3d 957, 962 (9th Cir. 2000). As stated previously, the jury instructions for Counts 26 and 27 should have specified that proceeds must be profits. We conclude that there is a high probability that this error substantially affected the jury verdict, as the sales commissions underlying these counts do not constitute profits.

**[16]** Under the last prong of the plain error standard, this court may exercise its discretion to notice the forfeited error only if the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Id.* at 963. The instructional error as to Counts 26-27 requires us to reverse these convictions because the government has not produced "overwhelming" evidence that the proceeds involved in these counts were in fact profits. *See id.*

2.   Counts 33 to 36

Counts 33 to 36, however, stand on different ground. The jury instructions for these counts required the jury to find the following:

First, the defendant transferred or caused to be transferred money from a place in the United States to a place outside the United States;

Second, the defendant knew that the property represented the proceeds of mail fraud or wire fraud;

Third, the defendant acted with the intent to promote the carrying on of mail fraud or wire fraud; and

Fourth, the defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, source, ownership, or control of the proceeds of mail or wire fraud.

[17] As further stated by the jury instructions, these counts charge Moreland with money laundering "in violation of Sections 1956(a)(2)(A) *and* 1956(a)(2)(B) of Title 18 of the United States Code." This point is significant because while § 1956(a)(2)(B) requires a showing of "proceeds," § 1956(a)(2)(A) does not. Furthermore, the jury instructions for Counts 33-36 are conjunctive, so their direction to find proceeds does not affect the validity of Moreland's conviction under § 1956(a)(2)(A), which requires only the transfer of funds from a place in the United States to a place outside the United States, or vice versa, with the intent to promote the carrying on of a specified unlawful activity. Therefore, because Moreland's convictions under Counts 33-36 are supported by § 1956(a)(2)(A), any error in omitting a profits definition for proceeds was not prejudicial. Accordingly, Moreland has not shown plain error as to these counts.[6]

---

[6]We note, however, a separate error in the judgment, which states that § 1956(a)(1) supports Moreland's convictions under counts 33-36. Because that is not the case, the district court is directed to amend that portion of the judgment on remand.

### 3. Count 38

**[18]** Moreland was also convicted under 18 U.S.C. § 1956(h) for conspiracy to commit money laundering as alleged in Count 38 of the indictment. The jury instructions for Count 38 state that the jury could find Moreland guilty of conspiracy to commit money laundering if "there was an agreement between two or more persons to commit money laundering." These instructions were erroneous under *Santos* and *Van Alstyne* because they permitted the jury to convict Moreland of conspiracy to launder money even if he agreed only to transfer gross receipts within the United States. The instructions do not define "money laundering," therefore permitting the jury to rely on the incorrect definition in Counts 26 and 27.

**[19]** We nonetheless uphold Moreland's conviction for Count 38 under plain error review because the government has presented "strong and convincing evidence" that the erroneous instruction was harmless. *See United States v. Harrison*, 585 F.3d 1155, 1161 (9th Cir. 2009). Even with proper instructions, the jury would have convicted Moreland of conspiring to commit money laundering, as defined by § 1956(a)(2)(A), because Moreland agreed to transfer funds outside of the United States in order to carry on his fraud. The jury found Moreland guilty of Counts 33-36, which accurately defined money laundering under § 1956(a)(2)(A). All of the evidence at trial demonstrated that the actions underlying those counts were taken subject to an agreement between Moreland and others. *See infra* at 14323-25. Also, the jury instructions for Count 38, though erroneous, did require the jury to find at least some agreement between Moreland and his co-conspirators. Because Moreland would have been convicted with correct instructions, the error in the instructions for Count 38 did not affect Moreland's substantial rights and his conviction must be upheld.

## C.

Moreland also challenges his convictions for money laundering and conspiracy to commit money laundering on the basis that there was insufficient evidence to support the jury's verdict. Because we reverse Moreland's convictions under Counts 26 and 27, we do not address Moreland's contentions as to those counts. However, we do address Moreland's convictions for promotion money laundering involving foreign transfers in violation of 18 U.S.C. § 1956(a)(2)(A) (Counts 33-36) and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) (Count 38), which are unaffected by *Santos*.

"Claims of insufficient evidence are reviewed de novo." *United States v. Shipsey*, 363 F.3d 962, 971 n.8 (9th Cir. 2004). There is sufficient evidence to support a conviction if, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

Regarding the four promotion counts (Counts 33, 34, 35, and 36), 18 U.S.C. § 1956(a)(2)(A) makes it a crime to transfer funds from the United States to a foreign country "with the intent to promote the carrying on of specified unlawful activity . . . ." 18 U.S.C. § 1956(a)(2)(A).[7] The specified unlawful activity in this case was mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343.

---

[7]Initially, we note that Moreland's latest arguments center on whether there is sufficient evidence to support his convictions under Counts 33-36 for concealment money laundering (18 U.S.C. § 1956(a)(2)(B)(i)), not promotion money laundering (§ 1956(a)(2)(A)). As demonstrated by Part III.B.2 of our opinion, we do not decide whether those counts may be upheld as concealment money laundering, which requires a showing of proceeds. *See* § 1956(2)(B)(i). Rather, we address whether there is sufficient evidence to uphold Counts 33-36 as promotion money laundering.

The counts on which Moreland was convicted, Counts 33-36, involved transfers from Meliorations's account in Washington to three international business corporation ("IBC") accounts in Samoa and an IBC account in the Bahamas. One of the Samoan IBCs, Millennium, was controlled by Moreland. Yet Moreland argues that the testimony offered at trial by Phillips and Fitzgerald demonstrated that only Zidar, Phillips, Fitzgerald, and William Cravens (who established offshore accounts for the enterprise) were directly involved in those transactions. According to Moreland, the prosecution offered no evidence that Moreland was involved in the transfers. Moreland argues, therefore, that his conviction is not supported by sufficient evidence.

**[20]** Moreland's claim regarding Count 34 is meritless. That count involved a wire transfer of $510,800 from Meliorations to Millennium, an IBC created and controlled by Moreland and used by him to pay his personal expenses. Phillips testified that this transfer was "for a trade" (i.e., an investment) and sent offshore to conceal it from the government—an act that also promoted the fraudulent scheme. Not only did the prosecution produce evidence in support of Moreland's culpability on this count, Moreland virtually admitted as much in his brief to this court by quoting a portion of Fitzgerald's testimony in which she states that Moreland "was behind Millennium." A rational juror could have concluded that Moreland was therefore involved with the transfer. Consequently, the evidence is sufficient to uphold his conviction on Count 34.

**[21]** There is also sufficient evidence to uphold Moreland's convictions on the other money laundering charges (Counts 33, 35, and 36) even though those transactions did not directly involve Moreland. Under *Pinkerton v. United States*, 328 U.S. 640 (1946), a conspirator is "criminally liable for the substantive offenses committed by a co-conspirator when they are reasonably foreseeable and committed in furtherance of the conspiracy." *United States v. Long*, 301 F.3d

1095, 1103 (9th Cir. 2002) (citing *Pinkerton*, 328 U.S. at 645-48). Pursuant to the *Pinkerton* doctrine, sufficient evidence exists in this case to uphold Moreland's convictions for the substantive money laundering charges provided that: (1) there is sufficient evidence to uphold his conviction for conspiracy, (2) the money laundering offenses were committed in furtherance of the conspiracy while Moreland was a member of the conspiracy, and (3) the actions providing the basis for the substantive charges were reasonably foreseeable to Moreland.[8] *Pinkerton,* 328 U.S. at 645-48.

**[22]** Section 1956(h) states that "[a]ny person who conspires to commit any offense defined in this section . . . shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C. § 1956(h). Moreland argues that he did not have knowledge of the objective of Zidar's money laundering conspiracy. "Knowledge of the objective of the conspiracy is an essential element of any conspiracy conviction." *United States v. Krasovich*, 819 F.2d 253, 255 (9th Cir. 1987). In asserting that he had no knowledge of the conspiracy, Moreland claims that he had no connection to Meliorations or access to its bank accounts, that his clients did not deposit their money in Meliorations's accounts, and that his function in the organization was merely to invest funds. "However, the existence of an agreement may be inferred from circumstantial evidence." *United States v. Fulbright*, 105 F.3d 443, 448 (9th Cir. 1997), *overruled on other grounds by United States v. Heredia*, 483 F.3d 913, 921 (9th Cir. 2007) (en banc); *see also United States v. Castro*, 972 F.2d 1107, 1110 (9th Cir. 1992) ("The government does not have to present *direct* evidence. Circumstantial evidence and the inferences drawn from that evidence will sustain a conspiracy conviction.") (emphasis in original). The evidence contradicts Moreland's contention.

---

[8]The jury was properly instructed on these elements.

The government introduced an overwhelming amount of evidence demonstrating Moreland's knowledge of the existence of the conspiracy and agreement to the conspiracy's objectives. Moreland worked with Zidar, Cravens, and Phillips to use foreign corporations and bank accounts to promote their fraud and hide their ill-gotten millions from the U.S. Government. A specific example is Cravens's testimony that the IBCs and Samoan bank accounts he set up specifically for Moreland (including the Millennium IBC and bank account) were set up to allow Zidar and Moreland to operate "privately and with the utmost secrecy," with the purpose of keeping money away from the government. Phillips testified that Zidar directed her to wire funds from Meliorations to Moreland's Millennium account in Samoa in order to keep the money away from the government. Agent Lawrence testified that new investor money was sent to Moreland's various accounts in the Bahamas, Samoa, and other locations, which money Moreland used to pay his Dexia and Millennium investors. Much more evidence was introduced at trial. Given the weight of the evidence, a rational juror could have found beyond a reasonable doubt that Moreland participated in the overall conspiracy to launder money and had knowledge of its objectives.

The evidence also supports the jury's finding beyond a reasonable doubt that the specific actions underlying the money laundering counts were committed in furtherance of the money laundering conspiracy while Moreland was a part of it, and that the offenses were reasonably foreseeable to Moreland. Moreland knew that Zidar, Cravens, and Phillips were transferring funds out of the country to hide the funds from the government, which promoted the fraudulent scheme. And he knew about the existence and use of all four foreign bank accounts involved in the transfers. Thus, a rational juror could find beyond a reasonable doubt that the particular transactions alleged in Counts 33, 35, and 36 were committed in furtherance of the conspiracy while Moreland was part of it and were reasonably foreseeable to Moreland.

**[23]** There is ample evidence that Moreland participated in the overarching conspiracy with knowledge of its objectives. There is also sufficient evidence to conclude that the transactions forming the basis for the substantive charges were committed in furtherance of the conspiracy while Moreland was a member of the conspiracy and were reasonably foreseeable to Moreland. As a result, there is sufficient evidence to uphold Moreland's conviction on the substantive money laundering charges under Counts 33-36 and the conspiracy charge under Count 38.

IV.

Finally, Moreland appeals the district court's order imposing over $36 million in restitution. The legality of a restitution order is reviewed de novo, unless it is within the statutory bounds, in which case we review for abuse of discretion. *United States v. Phillips*, 367 F.3d 846, 854 (9th Cir. 2004).

Congress passed the Mandatory Victims Restitution Act of 1996 (MVRA), 18 U.S.C. §§ 3663A-3664, as part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, § 206, 110 Stat. 1232 (1996), and as a supplement to the Victim and Witness Protection Act of 1982 (VWPA), 18 U.S.C. § 3663. *United States v. De La Fuente*, 353 F.3d 766, 769 (9th Cir. 2003). The MVRA makes restitution mandatory, without regard to a defendant's economic situation, to identifiable victims who have suffered physical injury or pecuniary loss from particular crimes, including offenses involving fraud or deceit. 18 U.S.C. § 3663A(a)(1), (c), § 3664(f)(1)(A); *United States v. Mays*, 430 F.3d 963, 965 (9th Cir. 2005); *United States v. Gordon*, 393 F.3d 1044, 1048 (9th Cir. 2004); and *United States v. Dubose*, 146 F.3d 1141, 1143 (9th Cir. 1998). The "primary and overarching goal" of the MVRA "is to make victims of crime *whole*, to *fully* compensate these victims for their losses and to restore these victims to their original state of well-being." *Gordon*, 393 F.3d at 1053 (internal quotations, cita-

tions, and emphasis omitted). For that reason, the statute "expressly directs the sentencing judge to award restitution in an amount equal to the value of the property on the date of the damage, loss, or destruction." *Id.* (internal quotation omitted). As such, the MVRA seeks "to restore the defrauded party to the position he would have had *absent* the fraud." *Id.* (internal quotation omitted).

**[24]** The procedures for identifying victims and the losses they sustained as a result of a defendant's criminal conduct are set forth in § 3664. The statute directs the sentencing court to order a probation officer to prepare a report providing "a complete accounting of the losses to each victim." 18 U.S.C. § 3664(a). To facilitate the preparation of this report, § 3664(d)(1) provides for the prosecutor, upon request of the probation officer, to consult with victims and, not later than 60 days before the sentencing date, to detail any losses subject to restitution. *Id.* § 3664(d)(1). Section 3664(d)(2) further provides that the probation officer, prior to submitting a report to the court, shall, to the extent practicable, provide notice of the court proceedings to all victims and afford them the opportunity to submit an affidavit detailing any losses subject to restitution. *Id.* § 3664(d)(2). "If the number or identity of victims cannot be reasonably ascertained, or other circumstances exist that make [preparing the report] clearly impracticable, the probation officer shall so inform the court." *Id.* § 3664(a). Where victims' losses are not ascertainable by a date 10 days prior to sentencing, the prosecutor or the probation officer shall inform the court, and "the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." *Id.* § 3664(d)(5). If a victim thereafter discovers losses that could not reasonably have been included in his or her initial claim for restitution, that victim may, within 60 days of discovering the loss, petition the court for an amended restitution order. *Id.*

In this case, the district court ordered restitution of approximately $36 million well after the 90-day limit had elapsed. At

the time of Moreland's original sentencing, on August 23, 2003, and at the request of the prosecution, the district court deferred the issue of restitution pending a determination by a receiver of the identities of victims and the amounts of their losses. The receiver did not complete its determination until March 2005. By that time, Moreland had appealed his original sentence and a prior panel of this court had already remanded for resentencing. On remand, the district court entered a restitution order for over $36 million. That order was issued over two years after the original sentencing took place. Moreland argues that the district court lacked jurisdiction to order restitution on remand because it failed to do so within the 90-day time frame set forth in § 3664(d)(5). We disagree. Moreland's timing argument would abrogate an obligation to pay millions of dollars in restitution to thousands of defrauded victims. Such an outcome would be antithetical to the purpose of the MVRA.

**[25]** The "intended beneficiaries" of the MVRA's procedural mechanisms "are the victims, not the victimizers." *United States v. Grimes*, 173 F.3d 634, 639 (7th Cir. 1999). The legislative history reveals Congress's intent that the time limits in § 3664 not be relied upon for protection by defendants. *See United States v. Cheal*, 389 F.3d 35, 49 (1st Cir. 2004). In its report on the bill that would become the MVRA, the Senate Judiciary Committee explicitly refused to relate the statute's procedural framework to the interest of defendants, stating that the "sole due process interest of the defendant being protected during the sentencing phase is the right not to be sentenced on the basis of invalid premises or inaccurate information." S. Rep. No. 104-179, at 18 (1995), *as reprinted in* 1996 U.S.C.C.A.N. 924, 930, *quoted in Cheal*, 389 F.3d at 49. Consequently, we recognized in *United States v. Cienfuegos*, 462 F.3d 1160 (9th Cir. 2006), that " 'the purpose behind the statutory ninety-day limit on the determination of victims' losses is not to protect defendants from drawn-out sentencing proceedings or to establish finality; rather, it is to protect crime victims from the willful dissipation of defendants'

assets.' " *Id.* at 1163 (quoting *United States v. Zakhary*, 357 F.3d 186, 191 (2d Cir. 2004)).

**[26]** Addressing two of the other timing requirements in § 3664 (the 10-day notice rule in § 3664(d)(5), and the 60-day requirement in § 3664(d)(1) regarding the amount of loss calculation), we held that § 3664's timing requirements are procedural, rather than jurisdictional. *United States v. Cienfuegos*, 462 F.3d 1160, 1162-63 (9th Cir. 2006). We concluded that the government's failure to comply with both of those requirements was subject to harmless error review. *Id.* This conclusion puts us in sync with the First, Second, Fourth, Sixth, Seventh, Eighth, and Tenth Circuits, which have held that § 3664's requirements are not jurisdictional. *See United States v. Cheal*, 389 F.3d 35, 49-50 (1st Cir. 2004); *United States v. Zakhary*, 357 F.3d 186, 191 (2d Cir. 2004); *United States v. Vandeberg*, 201 F.3d 805, 814 (6th Cir. 2000); *United States v. Johnson*, 400 F.3d 187, 199 (5th Cir. 2005); *United States v. Grimes*, 173 F.3d 634, 639 (7th Cir. 1999); *United States v. Balentine*, 569 F.3d 801, 806-07 (8th Cir. 2009); *United States v. Dolan*, 571 F.3d 1022, 1031 (10th Cir. 2009).[9]

In fact, Moreland's "jurisdictional argument is undermined by § 3664's provision for continued revision of the restitution order in light of later discoveries of losses." *Cheal*, 389 F.3d at 48. "The MVRA permits amendments to restitution order to reflect changed circumstances, and neither confers nor terminates the court's jurisdiction." *Vandeberg*, 201 F.3d at 814. If a district court's jurisdiction to order restitution did terminate after 90 days, the time limitation would "effectively nul-

---

[9]*But see United States v. Farr*, 419 F.3d 621, 623 (7th Cir. 2005) (distinguishing *Grimes* and holding that the district court exceeded its authority under § 3664 to issue restitution because it did not do so within the 90-day time limit, where it did not order restitution as part of the defendant's original sentence, but three years later added restitution as a condition of defendant's supervised release).

lify[ ]" the provision allowing for consideration of later-discovered losses. *Id.* Furthermore, the title of the provision itself—"Procedure for issuance and enforcement of order of restitution"—"advertises its procedural nature" and refutes the notion that § 3664(d)(5) is jurisdictional. *Cheal*, 389 F.3d at 48.

The legislative history also supports the notion that the "intended beneficiaries" of the MVRA's procedural mechanisms "are the victims, not the victimizers." *Grimes*, 173 F.3d at 639. The legislative history reveals Congress's intent that the time limits in § 3664 not be relied upon for protection of defendants. *See Cheal*, 389 F.3d at 49. In its report on the bill that would become the MVRA, the Senate Judiciary Committee explicitly refused to relate the statute's procedural framework to the interest of the defendants, stating that the "sole due process interest of the defendant being protected during the sentencing phase is the right not to be sentenced on the basis of invalid premises or inaccurate information." S. Rep. No. 104-179 at 18 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 930, *quoted in Cheal*, 389 F.3d at 49. Consequently, we recognized in *Cienfuegos* that " 'the purpose behind the statutory ninety-day limit on the determination of victims' losses is not to protect defendants from drawn-out sentencing proceedings or to establish finality; rather, it is to protect crime victims from the willful dissipation of defendants' assets.' " 462 F.3d 1163 (quoting *Zakhary*, 357 F.3d at 191).

**[27]** For that reason, in *Cienfuegos*, we concluded that "because the procedural requirements of section 3664 were designed to protect victims, not defendants, the failure to comply with them is harmless error absent actual prejudice to the defendant." 462 F.3d at 1163; *see also Zakhary*, 357 F.3d at 188 ("[F]ailure to determine losses within the § 3664(d)(5) time period will be deemed harmless error unless a defendant can show actual prejudice from the delay. . . . [A] presumption of harmlessness applies to any error in the timely identification of victims' losses."). Here, Moreland "cites no

prejudice from the delay in entering the restitution order." *Cheal*, 389 F.3d at 48. For example, Moreland does not claim that any documents or witnesses had become unavailable after the 90-day period elapsed, or that his financial status changed. *See United States v. Stevens*, 211 F.3d 1, 6 (2d Cir. 2000). Indeed, Moreland does not even allege that the delay caused any prejudice to his defense whatsoever. *See id.* at 6. In *Cienfuegos*, we held that the defendant failed to show prejudice, in part, because he had "the functional equivalent of notice" under § 3664(d)(5)'s requirements, since restitution was part of his plea agreement. 462 F.3d at 1163. Likewise, here, Moreland was aware that an order of restitution would be part of his sentence, as the district judge noted it on the record during the original sentencing hearing but deferred the calculation of the amount and identification of the victims at the prosecution's request. Thus, Moreland also had notice that the restitution order would later be imposed. Finally, Moreland was aware of the large amount of funds at issue based on the district court's findings to support the sentencing calculation. Therefore, the district court's error in failing to comply with the 90-day time limit was harmless. *See id.*

**[28]** Finally, the prosecution did not waive its right to seek restitution, as Moreland suggests. As an initial matter, restitution under the MVRA is not a right to be sought or waived by a prosecutor. Rather, as the name of the statute suggests, restitution is *mandatory* where the MVRA applies. Even so, in this case, the prosecution requested restitution in its original sentencing memorandum to the district court. At the prosecution's request, the court deferred ordering restitution until the receiver finished its report on victims' losses. Moreland's waiver argument is therefore undermined by both the record and the mandatory nature of the statute.

V.

The Supreme Court's decision in *Santos* requires us to REVERSE Moreland's convictions under Counts 26 and 27,

VACATE Moreland's sentence, and REMAND for resentencing. We AFFIRM the district court in all other respects.