**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee*,

    v.

MARK E. PHILLIPS,
        *Defendant-Appellant*.

No. 11-30195

D.C. No.
2:10-cr-00269-JCC-1

UNITED STATES OF AMERICA,
        *Plaintiff-Appellant*,

    v.

MARK E. PHILLIPS,
        *Defendant-Appellee*.

No. 11-30234

D.C. No.
2:10-cr-00269-JCC-1

OPINION

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, Senior District Judge, Presiding

Argued and Submitted
August 27, 2012—Seattle, Washington

Filed December 26, 2012

Before: Mary M. Schroeder and Ronald M. Gould,
Circuit Judges, and Jed S. Rakoff, Senior District Judge.[*]

Opinion by Judge Rakoff

---

### SUMMARY[**]

---

### Criminal Law

The panel reversed a mail fraud conviction and the district court's decision to deny the government's forfeiture application, but affirmed the district court in all other respects in a case arising from the defendant's fraudulent scheme to obtain, for personal use, funds from a high-tech startup company of which he was CEO.

The panel reversed the mail fraud conviction because the success of the fraudulent scheme did not depend in any way on the use of the mails. The panel affirmed the defendant's money laundering convictions because they do not raise a *Santos* merger problem, and "proceeds" should thus be defined as "gross receipts" rather than "profits" in the context of this case. The panel held that the prosecutor's references during closing argument to the defendant's lies during the

---

[*] The Honorable Jed S. Rakoff, Senior District Judge for the U.S. District Court for the Southern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

course of the fraudulent scheme and on the stand did not constitute misconduct.

Reviewing for plain error, the panel rejected the defendant's vagueness/overbreadth challenge to a supervised release condition prohibiting the defendant from "frequent[ing] places where controlled substances are illegally sold, used, distributed, or administered." The panel held that a reasonable person would understand that the condition prohibits the defendants from knowingly going to a specific place where drugs are illegally used or sold, but that it does not prohibit him from living in Seattle or going to a given neighborhood simply because a person is selling drugs somewhere within that neighborhood.

On the government's cross-appeal, the panel held that the district court erred by refusing to enter an in personam forfeiture judgment. The panel wrote that the rule in *Libretti v. United States*, 516 U.S. 29 (1995) – that there is no constitutional right to a jury verdict on forfeitability" in a criminal forfeiture proceeding – has not been abrogated by subsequent Supreme Court decisions; and that there is no statutory requirement for a jury determination where the government seeks only a money forfeiture.

---

**COUNSEL**

Lila Silverstein, Washington Appellate Project, Seattle, Washington, for Defendant-Appellant–Cross-Appellee.

Jenny Durkan, United States Attorney, Matthew Diggs (argued) and Aravind Swaminathan, Assistant United States Attorneys, Seattle, Washington, for Plaintiff-Appellee–Cross-Appellant.

## OPINION

RAKOFF, District Judge:

Mark Phillips, the former CEO of MOD Systems, Inc. ("MOD"), appeals from his conviction on four counts of wire fraud, one count of mail fraud, and two counts of money laundering.[1] These seven counts related to the same basic scheme: Phillips's successful plan to fraudulently obtain funds from MOD and use those funds for his personal benefit. After a jury trial, the district court sentenced Phillips to 48 months in prison and three years of supervised release. In his appeal, Phillips argues that his mail fraud and money laundering convictions should be reversed, that he should be granted a new trial because of Government misconduct during closing arguments, and that a condition of his supervised release should be stricken. The Government also cross-appeals and argues that the district court erred in rejecting the Government's application to enter a $100,000 *in personam* forfeiture judgment against Phillips. We reverse the mail fraud conviction and the district court's decision to deny the Government's forfeiture application, but we affirm the district court in all other respects.

---

[1] Phillips was acquitted of one count of attempted bank fraud.

In evaluating the sufficiency of the evidence for the mail fraud and money laundering convictions, we must view the facts in the light most favorable to the Government. *McDaniel v. Brown*, 130 S. Ct. 665, 673 (2010). The pertinent facts, viewed in that light, are as follows:

In May 2005, Phillips and Anthony Bay co-founded MOD, a high-tech start-up that was developing a platform to enable retailers to sell and distribute digital content to consumers. Phillips was MOD's majority shareholder, and from 2005 until he resigned in March 2009, Phillips was also MOD's CEO and a member of MOD's Board of Directors ("the Board"). Bay was Chairman of the Board during most of the relevant time period.

In January 2008, Phillips began using false invoices to steal money from MOD. He used that money to buy expensive watches, to invest in a private company, and to partially pay for a $2.3 million penthouse condo in Seattle. Many of the steps of the fraud were laid out in clear and painstaking detail in emails between Phillips and his girlfriend, Jan Wallace, as well as in numerous other emails with other parties.

In December 2007, Wallace introduced Phillips to Feel Good Watches, a fine watch retailer based in Arizona with which she had an arrangement. On December 10, 2007, Phillips wrote to Wallace that he would need MOD to do very well financially before he could purchase a certain Breguet watch. Eventually, however, Phillips decided to purchase two $30,000 Breguet watches from Feel Good Watches. Phillips agreed to pay for the first watch upon delivery and for the second watch in three installments of $10,000.

On January 15, 2008, Feel Good Watches mailed Phillips the first Breguet watch via Federal Express, and it was delivered to Phillips the following day. On the day that he received the watch, Phillips wrote to Wallace, "I received the watch, it's beautiful . . . If possible could I pay you for this so I can pay out of a company for consulting work." The next day, Phillips contacted Larry Garrett, his personal lawyer, and told him that Phillips wanted to pay a company called Wallace Black LLC ("Wallace Black") for consulting services that Wallace Black had purportedly provided to Phillips in his personal capacity. Phillips e-mailed Garrett, "Sorry, hate to use you as a merchant service, but the [sic] part of the attorney client privilege is nice too." Garrett agreed to route money to Wallace Black through Garrett's trust account. Garrett did not know that Phillips's girlfriend was the owner of Wallace Black.

Around the same time, Phillips told Ken Gordon, MOD's Vice President of Finance, that he wanted to pay a "few people" who had provided consulting services to *MOD* (rather than consulting for him *personally*). Gordon responded that he "need[ed] an invoice" from the consultants before Gordon could make any payments. Phillips then asked Garrett to send him an invoice so that Phillips could have it for his records. Garrett gave Phillips an invoice on the letterhead of his firm; the invoice stated that payment would be made to "Wallace Black" for "Consultant/Contract Services."

Phillips knew that the Board would not want to pay Phillips's girlfriend for consulting and that the Board had never authorized any payments to Wallace. Therefore, Phillips altered the invoice he got from Garrett to change the payee from "Wallace Black" to "W-Black" so that the Board

would not know that MOD was paying Wallace. Phillips then e-mailed Wallace to let her know that he had altered the invoice to change the name of her company.

Based on the false invoice, Gordon believed that Phillips was paying a consultant named W-Black for work done for MOD, and thus Gordon wired $30,000 of MOD funds to Garrett's trust account on January 18, 2008. If Gordon had known that Phillips was planning to use those funds for his personal benefit, he would not have wired the money. Four days after Gordon transferred the funds to Garrett's trust account, Phillips instructed Garrett to wire the $30,000 of MOD funds to Wallace Black's bank account. Later that same day, Wallace wired $30,000 to Feel Good Watches as payment for the Breguet watch that Phillips had received a week earlier.

On March 3, 2008, the owner of Feel Good Watches e-mailed Phillips seeking payment for the second Breguet watch that Phillips had ordered two months earlier. Phillips replied that he would send Feel Good Watches $20,000 to account for the two $10,000 installment payments that he had missed. That evening, Phillips emailed Wallace to tell her that he would send more money to her bank accounts and that she should wire that money to Feel Good Watches. Phillips took the first invoice that Garrett had sent him and changed the date, amount, and "Wallace Black" to "W. Black." Phillips gave this fake $60,000 invoice to Gordon, and Gordon, who still believed that the payment was for consulting services that were provided to MOD, wired $60,000 of MOD funds to Garrett's trust account. Garrett wired the $60,000 to Wallace Black, and the next day, Wallace, based on instructions from Phillips, sent a $20,000 payment to Feel Good Watches for

Phillips's second watch. This left $40,000 of MOD funds in Wallace Black's account.

On April 2, 2008, Phillips directed Wallace to wire $25,000 of those funds to pay for Phillips's investment in a high-tech startup called Sampa. On April 7, 2008, Paul Gross, the CEO of Sampa, wrote to Phillips and said, "We received a wire for $25K today but it came from Jan Wallace in Paradise Valley AZ. Is this from you?" Phillips replied, "Yes. This is from me." Gross then replied, "Mysterious but excellent."

On April 6, 2008, Phillips e-mailed Wallace and told her to wire the remaining $15,000 in MOD funds to his personal bank account. The next day, Phillips received the money from Wallace and used that money to partially fund a $50,000 earnest money deposit on the condominium he was purchasing.

On April 29, 2008, Feel Good Watches e-mailed Phillips to remind him that he still owed $10,000 for the second Breguet watch. Phillips forwarded this e-mail to Wallace the minute he received it along with the additional message, "I think I need to wire you more money." On Monday May 12, 2008, Phillips e-mailed Wallace, and asked her to pay Feel Good Watches, promising to pay her back. When Wallace said that she would need money to be sent to Wallace Black by Wednesday, May 14th, because she was short on cash, Phillips responded, "I'll ask[] Kenn [Gordon] to pay this tomorrow. Thanks." The same day, Phillips provided another fake invoice to Gordon, and Gordon made another $10,000 transfer to Garrett's trust account on May 15, 2008. Again, Garrett transferred the money to Wallace Black, and Wallace

used the money to pay the final $10,000 that Phillips owed to Feel Good Watches for the second Breguet watch.

Around November 2007, Phillips began negotiations with MOD to license intellectual property and technology owned by a company he had started called AnythingBox. MOD's corporate counsel, Bill Bromfield, and two members of the Board told Phillips several times that any licensing agreement with AnythingBox required the approval of the Board because Phillips had a conflict of interest in the transaction.[2]

On April 21, 2008 Phillips was told that he needed $1 million to pay for the full down payment for his condominium. Phillips requested that Bay, the Chairman of the Board, approve an advance payment of $1.5 million to Phillips based on the anticipated license of the AnythingBox technology, but Bay twice refused those requests. Nonetheless, on April 25, 2008, Phillips told Gordon to transfer $1.5 million of MOD funds to Phillips's personal bank account as payment for the AnythingBox license. Phillips falsely told Gordon that Bay and another board member — who together constituted a majority of the Board — had approved the wire transfer as a prepayment for the AnythingBox license. Based on Phillips's representation of Board approval, Gordon wired $1.5 million from MOD's bank account to Phillips's personal bank account.

A month after Gordon wired the $1.5 million to Phillips's bank account, Phillips wired a $992,972.95 down payment for the condominium. Nearly all of that down payment was

---

[2] MOD ultimately licensed AnythingBox's technology in the fall of 2008 because its investors, including Toshiba Corporation, insisted that MOD do so before they would invest millions in MOD.

derived from the $1.5 million MOD wire transfer. Phillips wrote several e-mails to his financial advisor and his accountant stating that he would use the money from MOD to make the down payment.

In late May 2008, the Board discovered that Phillips had ordered the transfer of $1.5 million in MOD funds without Board permission. The Board demanded that Phillips return the money, and Phillips did so.

In mid-December 2008, Robert Arnold, one of MOD's largest investors, alleged that Phillips had misappropriated MOD's assets and breached his fiduciary duties to MOD. MOD set up a demand review committee, and Phillips agreed to resign from his positions at MOD and to relinquish his majority shareholder control over MOD.

Eventually, the United States Attorney for the Western District of Washington brought criminal charges against Phillips. Phillips was charged with four counts of wire fraud (Counts 1–4) and one count of mail fraud (Count 5). Counts 1–3 involved the three wire transfers between Garrett's trust account and Wallace Black that totaled $100,000 in MOD funds. Count 4 concerned the April 28, 2008, wire transfer of $1.5 million from MOD's bank account to Phillips's personal bank account. Count 5 involved the mailing of the first Breguet watch on January 15, 2008. The Superseding Indictment also charged Phillips with two counts of money laundering. Count 6 related to the $15,000 of MOD funds that Phillips used as part of the payment for his condominium. Count 7 was based on the $992,972.75 of MOD funds that Phillips used to finance the down payment for the condominium.

At his trial, Phillips testified in his own defense. He testified that the $100,000 in payments to Wallace was for consulting work.[3] He also testified that Wallace purchased the watches from Feel Good Watches as unrelated gifts to Phillips.[4] As to the $25,000 Sampa investment, Phillips testified that Wallace purchased the stock for Phillips, but that Phillips was planning to reimburse Wallace for it. Therefore, Phillips stated that "[t]his would be a gift that I would repay her for." Finally, Phillips testified that the $15,000 wired from Wallace Black to his bank account, which he then used as part of the payment for his condominium, was simply Wallace repaying him for patent and legal expenses that Phillips had incurred on Wallace's behalf. Asked about one remarkable chain of events, where 1) Feel Good Watches emailed Phillips to tell him that he owed $10,000 for the second Breguet watch, 2) Phillips emailed Wallace within a minute to tell her that he was going to wire her money, 3) Phillips later asked Wallace to pay Feel Good Watches and said that he would pay her back, 4) five hours later Phillips ordered Gordon to pay $10,000 to Wallace-

---

[3] Wallace had testified on direct examination in the Government's case in chief that she had done work on at least two occasions for MOD, although she primarily worked for MetaWallet, another of Phillips's companies. And although Phillips testified that the MOD Board knew of Wallace's work for MOD in 2007, he wrote an email in March 2008 introducing Wallace to the Board. Moreover, at least two Board members responded to Phillips's email and objected to retaining Wallace to provide services to MOD.

[4] Wallace testified on direct examination in the Government's case in chief that she had previously purchased expensive watches, including a Breguet watch, as gifts for Phillips. But she testified that she had not purchased the two watches in question as gifts for Phillips, and the chain of emails and money transfers described above fully supported Wallace's story.

Black, and 5) Wallace then paid $10,000 to Feel Good Watches, Phillips called the $10,000 transfer and $10,000 payment a "convenient coincidence."

Phillips also testified that Bay had approved the $1.5 million transfer of MOD funds around April 7, 2008, despite an email that Phillips wrote to Bay two weeks later asking for permission for the transfer and stating that "approval and movement would greatly help my state right now." Phillips also testified that he told David Douglass, MOD's CFO, that the $100,000 in payments was for Wallace's consulting work. Phillips admitted to doctoring the invoices, but he testified that he showed Douglass the fake invoices and requested that Douglass book the $100,000 to him personally "as a bonus," in order to be "very clean." Phillips also testified that he told Douglass that he had altered these invoices.

In its rebuttal case, the Government called Douglass, and he testified that he had never seen the fake invoices prior to his work on MOD's demand review committee in January 2009. Douglass also testified that Phillips never told him that the funds should be booked to Phillips personally, and that Phillips never told Douglass that he had altered the invoices.

At the close of the Government's case, Phillips moved for a judgment of acquittal. The district court denied Phillips's motion, and Phillips did not renew his motion at the close of trial. In closing argument, Government counsel referred to Phillips's statements – both in executing the scheme and in his testimony – and repeatedly stated that Phillips had "lied." At the start of his closing, for example, Government counsel stated that Phillips's conduct was "tied together by a couple of themes. When the defendant saw something he wanted, he lied to get it." Phillips did not object to these statements when

they were made. After less than one full day of deliberations, on March 3, 2011, the jury returned its verdict convicting Phillips of Counts 1–7, and acquitting him of Count 8 (the attempted bank fraud charge).

The Superseding Indictment also contained a forfeiture notice stating that the Government would seek an *in personam* forfeiture judgment of $100,000. This $100,000 figure was based on the total amount obtained by the wire frauds described in Counts 1–3.[5] After the jury was discharged, the Government reminded the district court that "there was a forfeiture allegation in the indictment," and that "[t]he government intends to seek a money judgment, which . . . can be dealt with at the time of sentencing." The parties disputed whether a jury instruction had been necessary on forfeiture, and the court deferred a ruling on this dispute until sentencing. In its sentencing memorandum, the Government argued that an *in personam* forfeiture judgment against Phillips was appropriate. Phillips opposed the forfeiture by arguing that "[t]he government submitted no jury instruction as required by Rule 32.2(b)(5) [sic]," and that because "no inquiry was made prior to jury deliberations beginning whether either party requested a jury determination of forfeiture," the government could not obtain a forfeiture judgment against Phillips. At sentencing, the district court "declin[ed] to enter the order of forfeiture," explaining, "I just think there are too many procedural problems with it, and I just think it's not necessary in this case."

The district court then proceeded to sentencing. The court found that Phillips had willfully obstructed justice by

---

[5] The forfeiture notice also stated that the Government intended to seek forfeiture of the two Breguet watches.

intentionally providing false trial testimony about at least one material matter.[6] As a result of this finding, the district court increased Phillips's guidelines range by two levels.

The district court sentenced Phillips to 48 months of imprisonment. In addition to the term of incarceration, the court imposed a three-year term of supervised release with standard and special conditions. One of the standard conditions of supervised release was that Phillips "shall not frequent places where controlled substances are illegally sold, used, distributed or administered." Phillips did not object to any of the conditions of supervised release.

For the following reasons, this Court reviews all of Phillips's challenges for plain error. Since Phillips did not renew his motion for a judgment of acquittal following the submission of all of the evidence, we review the sufficiency of the evidence questions for plain error. *United States v. Cruz*, 554 F.3d 840, 844 (9th Cir. 2009). We review any unpreserved legal errors in the jury instruction for plain error. *United States v. Moreland*, 622 F.3d 1147, 1166–67 (9th Cir. 2010). We also review an unpreserved challenge to the prosecution's conduct in closing argument for plain error. *United States v. Washington*, 462 F.3d 1124, 1136 (9th Cir. 2006). Finally, we review for plain error a condition of supervised release not challenged in the district court. *United States v. Vega*, 545 F.3d 743, 747 (9th Cir. 2008). Under the

---

[6] In particular, the district court concluded that Phillips had testified falsely about 1) his alleged disclosure of the Wallace Black invoices to David Douglass; 2) his purported statements to Douglass about the reasons for altering those invoices; 3) his assertion that the $100,000 was for Jan Wallace's services, as opposed to Phillips's personal benefit; 4) the purported permission that Phillips received to make the $1.5 million transfer.

plain error standard, relief is not warranted unless there has been: (1) "error," (2) that was "plain," (3) that affected "substantial rights," and (4) that "seriously affect[ed] the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Recio*, 371 F.3d 1093, 1100 (9th Cir. 2004) (internal quotation marks omitted).

As to the cross-appeal, we review *de novo* the district court's decision not to impose an *in personam* forfeiture judgment. *See United States v. Newman*, 659 F.3d 1235, 1239 n.2 (9th Cir. 2011).

## MAIL FRAUD

We turn first to Phillips's challenge to the sufficiency of the evidence on his conviction for mail fraud on Count 5 of the Superseding Indictment.[7] To secure a conviction on this count, the Government must prove that Phillips: (1) "devised or intend[ed] to devise a scheme to defraud (or to perform

---

[7] The mail fraud statute, 18 U.S.C. § 1341, makes it unlawful for any person:

> [H]aving devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do . . . [to] deposit[] or cause[] to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or take[] or receive[] therefrom, any such matter or thing, or knowingly cause[] to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing[.]

specified fraudulent acts);" and (2) that he "use[d] . . . the mail for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts)." *Carter v. United States*, 530 U.S. 255, 261 (2000).

The scheme charged in Count 5 was that Phillips "devise[d] and intend[ed] to devise a material scheme to defraud MOD and to obtain money from MOD by means of material false and fraudulent pretenses, representations and promises and the concealment of material facts." Therefore, the scheme was to defraud MOD and to obtain money from MOD. The only asserted use of the mails was Feel Good Watches's mailing of the first Breguet watch to Phillips. Phillips, citing to *United States v. Maze*, 414 U.S. 395 (1974), argues that the mailing was not in furtherance of the fraudulent scheme to defraud MOD, and that Phillips "simply used the money he obtained from MOD to purchase a watch."

In *Maze*, the defendant used a stolen bank card to obtain food and lodging at motels, and those motels, with Maze's knowledge, mailed invoices for the goods and services that the defendant had received. The *Maze* Court assumed that the evidence supported a finding that Maze had caused the mails to be used, but found that the "more difficult question is whether these mailings were sufficiently closely related to [Maze's] scheme to bring his conduct within the statute." 414 U.S. at 399. Finding that the success of the defendant's scheme did not depend in any way on the mailings at issue, the Supreme Court reversed the conviction. *Id.* at 402.

Here, as in *Maze*, the success of Phillips's fraudulent scheme did not depend in any way on the use of the mails. The fact that Phillips purchased a watch with $30,000 of fraudulently obtained MOD funds, instead of using the funds

for his personal benefit in some other fashion, did not in any way affect the scheme "to defraud MOD and to obtain money from MOD," as charged in Count 5. The fact that payment eventually was made to a watch dealer and that watch dealer mailed a watch in return was not a *part of the scheme to defraud* MOD and to obtain money from MOD – it was simply the byproduct of that scheme. Put another way, as a result of Phillips's successful execution of his scheme to defraud, he had sufficient funds to pay for the watch.

Therefore, even under the demanding plain error standard, Phillips's mail fraud conviction must be reversed.

## MONEY LAUNDERING

We turn next to Phillips's challenge to the sufficiency of the evidence for his money laundering convictions. As with the mail fraud conviction, we review the money laundering conviction for plain error to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

Counts 6 and 7 of the Superseding Indictment charged Phillips with money laundering in violation of 18 U.S.C. § 1957. That provision makes it unlawful to "knowingly engage[] or attempt[] to engage in a monetary transaction in criminally derived property of a value greater than $10,000," if that property "is derived from specified unlawful activity." 18 U.S.C. § 1957(a). Phillips's wire and mail frauds were the specified unlawful activity in this case. *See* 18 U.S.C. § 1957(f)(3); 18 U.S.C. §§ 1956(c)(7)(A), 1961(1)(B). The two "monetary transactions" charged in Counts 6 and 7 were 1) the $15,000 portion of the earnest money down payment (Count 6), and 2) the nearly $1 million down payment (Count

7) that Phillips made in connection with his condominium purchase.

Phillips does not contest that there was sufficient evidence for a rational juror to conclude that Phillips committed the $60,000 wire fraud charged in Count 2 and that the $15,000 at issue in Count 6 came from that $60,000 wire fraud. Phillips also does not contest that there was sufficient evidence for a rational juror to conclude that he committed the $1.5 million wire fraud charged in Count 4 and that Phillips used money from that wire fraud to make the million dollar down payment on his condominium. Instead, Phillips argues that the Government failed to adduce sufficient evidence that the alleged money laundering transactions were funded with the "profits" of his crimes, rather than the "gross receipts" of those crimes. He further argues that the jury instructions on these counts were erroneous because they did not define the "proceeds" of the unlawful activity as "profits" rather than "gross receipts." These two challenges turn on the same legal question: whether "proceeds" of the unlawful activity, a term which is undefined in the money laundering statutes in place at the time of the instant events,[8] should be defined as "gross receipts" or "profits" in the context of this case.

In *United States v. Santos*, 553 U.S. 507 (2008), the Supreme Court considered a habeas petition brought by a petitioner convicted of operating an illegal lottery in bars and

---

[8] In 2009, Congress amended the money laundering statutes to define proceeds to include "gross receipts" of unlawful activity. Pub. Law 11-21 §(2)(f), 123 Stat. 1617, 1618 (May 20, 2009) (codified at 18 U.S.C. § 1956(a)(9), 18 U.S.C. § 1957(f)(3)). This amendment does not apply retroactively, and is thus inapplicable in this case.

restaurants in Indiana. *Id.* at 509. Santos employed "runners" and "collectors" to help him conduct this lottery; the runners would gather bets from gamblers and deliver the funds to the collectors. The collectors in turn delivered the money to Santos; Santos would then use some of that money to pay the runners' commissions, the collectors' salaries, and the lottery winners' winnings. *Id.* at 509. These payments to the runners, collectors, and winners were the basis for the money laundering charges brought against Santos. Santos argued that his money laundering convictions could not stand because his purported money laundering transactions were simply the distribution of *gross receipts* from gamblers to his employees and winners of the lottery, and were not *profits* of the illegal lottery. *Santos*, 553 U.S. at 510. A plurality of the Court, in an opinion written by Justice Scalia, found that the term "proceeds" in 18 U.S.C. § 1956 could mean either profits or gross receipts according to both dictionary definitions and other usages of the term in the U.S. Code. *Id.* at 511–12. Moreover, the plurality concluded that defining proceeds as either profits or gross receipts would make sense in the context of the statute. *Id.* at 512–14. The plurality then determined that the rule of lenity weighed in favor of defining proceeds as "profits" rather than gross receipts, and therefore that in the context of 18 U.S.C. § 1956, proceeds should always be defined as "profits." *Id.* at 514.

Justice Stevens provided the fifth vote for affirming the Seventh Circuit and granting the habeas petition, but he did not join in Justice Scalia's opinion. Thus, as the plurality recognized, the Court's holding was limited by his concurrence. *See id.* at 523. Justice Stevens rejected the plurality's uniform definition of proceeds as profits and concluded that "proceeds" could mean "profits" with respect to one predicate crime and "gross receipts" with respect to

another. *Santos*, 553 U.S. at 528 n.7 (Stevens, J., concurring). Justice Stevens concluded that with respect to the predicate crime of operating a gambling business, "proceeds" meant "profits." *Id.* at 528.

In the last three years, we have had several opportunities to analyze the proper application of *Santos* to money laundering cases that involve predicate crimes other than the predicate crime that was at issue in *Santos*. *See United States v. Bush*, 626 F.3d 527, 536 (9th Cir. 2010); *Moreland*, 622 F.3d 1147; *United States v. Van Alstyne*, 584 F.3d 803 (9th Cir. 2009). Those opinions preclude Phillips's argument in this case. As an initial matter, it is important to note that although *Santos* addressed only the money laundering statute codified at 18 U.S.C. § 1956, we have already held that *Santos* applies "with equal force" to 18 U.S.C. § 1957, the statute at issue in this case. *Bush*, 626 F.3d at 536.

In *United States v. Van Alstyne*, we applied *Santos* for the first time and held that "'proceeds' means 'profits' where viewing 'proceeds' as 'receipts' would present a 'merger' problem of the kind that troubled the plurality and concurrence in *Santos*." 584 F.3d at 814. Applying that merger analysis, we overturned two money laundering convictions committed in furtherance of a Ponzi scheme because the evidence at trial showed that the transactions involved putative dividends that the defendant paid in order to encourage investors to make further principal contributions. *Id.* at 809–10, 815. We upheld a third money-laundering conviction, however, where the transaction at issue involved the refund of an investor's principal outlay and thus left fewer funds "available to lull other investors into maintaining their investment." *Id.* at 816.

As we stated in *Van Alstyne*, the question we must ask to determine if proceeds means profits or gross receipts is whether the money laundering "was a central component" of the defendant's criminal scheme. *Id.* at 815. As Justice Stevens stated in his concurring opinion in *Santos*, a defendant should not be punished twice for "transactions that normally occur during the course of running" an illegal scheme. 553 U.S. at 517. In fact, "[f]or Santos to have run his lottery, he *had* to pay his employees and the lottery winners — indeed, without such payments his crime was nothing but simple theft." *Bush*, 626 F.3d at 537.

Therefore, in *Moreland*, we reversed money laundering convictions that were "central to carrying out [a pyramid] scheme's objective of encouraging further investment." 622 F.3d at 1166. But, in *Bush*, we upheld money laundering convictions even though they were part of a Ponzi scheme, because the predicate crimes "were all distinct from the money laundering, thus alleviating any merger concerns." 626 F.3d at 537.[9]

---

[9] Phillips implicitly concedes the merger question by making only one argument in response to the Government's lengthy discussion of the *Santos* merger analysis. Phillips argues that the Government cannot have it both ways with respect to the mail fraud and money laundering counts, and that if the money laundering purchases were not central to the scheme such that there is no merger problem, then the mail fraud conviction must be overturned because the watch purchase was also not part of the scheme to defraud. Therefore, Phillips implicitly concedes the merger question by arguing that *either* the money-laundering or the mail fraud must be reversed. Since we have now reversed his mail fraud conviction, *supra*, Phillips's sole argument for reversal of the money laundering counts on the merger issue is now rendered moot.

We affirm the convictions on Count 6 and 7 because Phillips's money laundering convictions do not raise a *Santos* merger problem, and thus proceeds should be defined as "gross receipts" for the purposes of Phillips's crime. The alleged money laundering transactions at issue here, the $15,000 payment of a portion of the earnest money payment and the nearly $1 million down payment were far from a central component of the fraudulent scheme. These transactions did not occur in the normal course of running the scheme. Instead, they were classic money laundering transactions, and they did not further the scheme to steal money from MOD in any way. There is no evidence that MOD was more likely to fall victim to Phillips's fraud because he used this money to make a payment on his condominium, much less that this payment was "central" to his fraudulent scheme. Instead, the money laundering transactions were made to further Phillips's "personal interest in veiling the sources of his income from public authorities." *See Bush*, 626 F.3d at 538.

There is no dispute that if "proceeds" are defined as "gross receipts" in this case, there was sufficient evidence to convict Phillips on the money laundering counts.[10] Moreover, for the same reasons, Phillips's asserted error in the jury instructions – that the jury was not instructed that proceeds meant profits – fails because proceeds did not mean profits in this case. *See Bush*, 626 F.3d at 537 (jury instructions that did

---

[10] In light of our analysis above, we need not reach the Government's alternative argument that even if proceeds were defined as profits in this case, the Government introduced sufficient evidence for the jury to convict on the money laundering counts.

not define proceeds as profits are only erroneous if a *Santos* merger problem exists).[11]

## STATEMENTS IN CLOSING ARGUMENT

We turn next to the statements by the prosecutor during closing argument. During his closing argument, the prosecutor argued that Phillips had told numerous lies, both to MOD employees during the course of his fraudulent scheme and also to the jury when he took the stand in his own defense. "[A] prosecutor may not express *his opinion* of the defendant's guilt or his belief in the credibility of [government] witnesses," *Moreland*, 622 F.3d at 1161 (emphasis added) (quoting *United States v. McKoy*, 771 F.2d 1207, 1211 (9th Cir. 1985)); but, on the other hand, "the prosecution must have reasonable latitude to fashion closing arguments." *Id.* (quoting *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991)). Therefore, it is "neither unusual nor improper for a prosecutor to voice doubt about the veracity of a defendant who has taken the stand." *United States v. Birges*, 723 F.2d 666, 672 (9th Cir. 1984). In particular, it is proper for the prosecutor to refer to a

---

[11] In *Santos*, the plurality and Justice Stevens also found that the application of the rule of lenity was particularly appropriate because Santos's illegal lottery counts carried a five-year statutory maximum, while the money laundering convictions had a statutory maximum of twenty years. 553 U.S. at 516, 527. In *Bush*, this Court found that those considerations did not apply when the mail and wire-fraud convictions had a thirty year maximum, and the money laundering conviction had a ten-year maximum sentence. 626 F.3d at 538. Here, similar to *Bush*, the wire fraud and mail fraud carried maximum sentences of twenty years, while the money laundering carried a maximum sentence of ten years. Phillips's guideline range was 97 to 121 months, but, as noted above, he was sentenced to 48 months.

defendant's lies if he is "commenting on the evidence and asking the jury to draw reasonable inferences." *Garcia-Guizar*, 160 F.3d at 520. Applying this rule, we have allowed even repeated references to the defendant's alleged lies. *See, e.g.*, *United States v. Rude*, 88 F.3d 1538, 1548 (9th Cir. 1996) (concluding that a prosecutor's use of the words "lie," "lies," or "lied" over 90 times in closing argument in reference to the defendant was "within the boundaries of proper . . . summations.").

As noted above, the prosecutor's references to Phillips's alleged lies can be separated into two categories. The first category includes Phillips's lies during the course of the fraudulent scheme. A fraud case will almost always be built on assertions that the defendant deceived or lied to the victims and others, and it was clearly appropriate to point out those alleged lies here. The second category includes assertions that Phillips lied on the stand. Under our case law, it is clear that this is a proper line of attack for a closing statement, as long as the prosecutor is commenting on the evidence and asking the jury to draw reasonable inferences. The prosecutor here did not give his own opinion of the defendant's guilt, and the comments were made in the context of explaining why the evidence contradicted Phillips's testimony.

Moreover, it is important to note that Government counsel said that the defendant "lied" rather than calling the defendant a "liar." It is clear that stating that the defendant lied by making a particular statement is less problematic than calling him a liar in general, since, in certain circumstances, the latter could have the tendency to overtake the role of the jury as the

arbiter of credibility. But no such tendency was remotely present here.[12]

## SUPERVISED RELEASE

Phillips's last challenge is to one of his conditions of supervised release. The district court sentenced Phillips to three years of supervised release to commence after his term of imprisonment. The district court also imposed a number of standard conditions of supervised release, including a condition prohibiting Phillips from "frequent[ing] places where controlled substances are illegally sold, used, distributed, or administered." Phillips now asserts that this condition is "vague and overbroad." But Phillips did not object to the imposition of this condition at the time of sentencing, and thus Phillips must show that the district court plainly erred in imposing the condition.

Phillips argues that the term "frequenting places" in the standard condition is so vague and overbroad that it would prohibit him from visiting many neighborhoods in Seattle where he lived before he was imprisoned, and perhaps that it would actually prohibit him from living and working in Seattle altogether. Using news articles, Phillips points out that there are several Seattle neighborhoods identified by the police as "high drug" neighborhoods. Phillips argues that the term "places" in the standard condition can be interpreted as

---

[12] Moreover, the judge had specifically instructed the jury that the statements by either attorney in closing argument were not to be considered as evidence, and that the only evidence properly considered was the testimony of the witnesses, the exhibits, and any stipulations. This instruction also helped to ensure that any error did not affect the outcome of Phillips's trial. *See Moreland*, 622 F.3d at 1162.

"neighborhoods" and therefore the condition either prevents Phillips from frequenting "entire neighborhoods" in Seattle – including the neighborhoods where he used to live and work and the neighborhood where his current attorney has her offices, or it leaves Phillips so confused about what he can and cannot do that it restricts his freedom of movement. Phillips then goes on to argue that since, in a city like Seattle, "every neighborhood is a place where at least one person is illegally using or distributing drugs," this condition of supervision "literally . . . prohibits [him] from going anywhere" in Seattle.

A condition of supervised release violates due process "if it either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *United States v. Soltero*, 510 F.3d 858, 866 (9th Cir. 2007) (per curiam) (internal citations and quotation marks omitted). In *United States v. Vega*, 545 F.3d 743 (9th Cir. 2008), building on our *Soltero* decision, we rejected a challenge to a supervised release condition that prohibited the defendant from "associating with any member of any criminal street gang." *Id.* at 746. We found that the term "associate" was not impermissibly vague because "men of common intelligence" could understand its meaning. In order to uphold the condition, we imported a mens rea element so that the defendant was prohibited from *knowingly* associating with members of a criminal street gang. *Id.* at 749–50.

Here, we hold that a reasonable person would understand that the prohibition on "frequent[ing] places" where illegal drugs are used or sold prohibits Phillips from *knowingly* going to a specific place where drugs are illegally used or sold, but that it does not prohibit him from living in Seattle or

going to a given neighborhood simply because a person is selling drugs somewhere within that neighborhood. *See United States v. King*, 608 F.3d 1122, 1128 (9th Cir. 2010) (violations of supervision conditions "require an element of *mens rea*"). Moreover, as in *Soltero* where "incidental contact" did not qualify as association, 510 F.3d at 866–67, incidental contact with such places here would not constitute "frequenting." Frequent in this context means to "be in . . . often or habitually." Merriam-Webster's Collegiate Dictionary, 11th Edition (2003). Under this common sense reading of the term of supervised release, it is neither vague nor overbroad.[13]

Therefore, Phillips has failed to meet the high bar necessary to show that the district court committed plain error in imposing this standard condition.

**FORFEITURE**

Finally, we turn to the Government's cross-appeal. The district court did not impose the *in personam* forfeiture judgment because it found that there were "too many

---

[13] There is an additional layer of protection for Phillips, because if his supervised release is revoked, the court "will examine the findings to [e]nsure that [his] due process right to notice of prohibited conduct has been observed and to protect him from unknowing violations." *United States v. Romero*, 676 F.2d 406, 407 (9th Cir. 1982). The Government argues that this extra layer of protection renders Phillips's challenge premature, but we disagree. *See Vega*, 545 F. 3d at 750. Although Phillips will have an additional layer of protection should he be accused of violating that term of supervised release, if his challenge had merit he should not have to wait until after he was arrested and forced to endure proceedings on this violation in order to have the condition declared vague or overbroad.

procedural problems with" the Government's forfeiture application, SER 627, and because the court found that a forfeiture judgment was "not necessary in this case." SER 627. The district court did not explain the rationale behind its conclusion that there were too many procedural problems with the request for forfeiture, but presumably this conclusion was based on Phillips's argument that forfeiture had not been determined by the jury. Because we are reviewing *de novo* the district court's refusal to impose a forfeiture judgment, however, we need not speculate as to why the district court came to its conclusion.

The Government sought forfeiture under 18 U.S.C. § 981 and 28 U.S.C. § 2461(c). Section 981 states:

> The following property is subject to forfeiture to the United States:
>
> . . . .
>
> (C) Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of [specified sections] of this title or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

There is no dispute that the wire fraud of which defendant was convicted is specified unlawful activity for the purposes of this forfeiture statute. 28 U.S.C. § 2461(c), in turn,

provides for "*criminal* forfeiture whenever civil forfeiture is available *and* the defendant is found guilty of the offense." *United States v. Newman*, 659 F.3d 1235, 1239 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 1817 (2012) (emphasis in original). That statute says that when those criteria have been met, the district court "*shall order* the forfeiture of the property as part of the sentence." 28 U.S.C. § 2461(c) (emphasis in original); *see Newman*, 659 F.3d at 1239. As we held in *Newman*, "the mandatory nature of that phrase is clear . . . ." 659 F.3d at 1240. In contrast to a fine, "which the district court retains discretion to reduce or eliminate, the district court has *no discretion* to reduce or eliminate mandatory criminal forfeiture." *Id.* (emphasis added). Therefore, "[w]hen the government has met the requirements for criminal forfeiture, the district court must impose criminal forfeiture, subject only to statutory and constitutional limits." *Id.*

None of those limits on forfeiture applies here. The only constitutional issue that Phillips raises is his assertion that the issue of forfeiture should have been decided by the jury. But there is no constitutional "right to a jury verdict on forfeitability" in a criminal forfeiture proceeding. *Libretti v. United States*, 516 U.S. 29, 49 (1995). Phillips argues that the Supreme Court's clear and dispositive holding in *Libretti* has been abrogated by subsequent Supreme Court cases that increased the range of issues that must be decided by a jury. *See United States v. Booker*, 543 U.S. 220 (2005); *Apprendi v. New Jersey*, 530 U.S. 466 (2000). But as the Second Circuit has recognized, "Because *Libretti* has direct application in this case, we are bound by its holding even if it might appear 'to rest on reasons rejected in some other line of decisions.'" *United States v. Fruchter*, 411 F.3d 377, 380 (2d Cir. 2005) (quoting *Rodriguez de Quijas v.*

*Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989)). Phillips cannot point to any Supreme Court case that abrogates or overturns *Libretti*.

Indeed, every Circuit to consider the question has found that *Libretti* has not been abrogated by subsequent Supreme Court decisions.[14] Nor did the Supreme Court's recent decision in *Southern Union Co. v. United States*, 132 S. Ct. 2344 (2012) abrogate *Libretti*. In *Southern Union*, the Supreme Court held that the Sixth Amendment right to a jury determination of "any fact, other than the fact of a prior conviction, that increases a criminal defendant's maximum potential sentence" applies to "sentences of criminal fines." *Id.* at 2348–49.[15] *Southern Union,* however, is not on point, because, as we have previously stated, forfeiture is not a fine. *Newman,* 659 F.3d at 1240. As we explained in *Newman*,

---

[14] We have not specifically addressed the question of whether a jury determination is necessary in order to impose a civil forfeiture judgment, but we have concluded that *Apprendi v. New Jersey*, 530 U.S. 466 (2000), did not change the rule that forfeiture need only be proven by a preponderance of the evidence, thus implying that *Apprendi* did not upset the rule of *Libretti*. *United States v. Shyrock*, 342 F.3d 948, 991 (9th Cir. 2003) ("We therefore join all other circuit courts of appeals that have considered the question, and conclude that *Apprendi* does not disturb the rule that statutorily-prescribed forfeiture is constitutional when supported by the preponderance of the evidence.").

[15] In *Southern Union*, the defendant was subject to a maximum fine of $50,000 for each day it violated federal environmental statutes. *Id.* at 2349. The jury verdict form stated that the company had engaged in violations for *approximately* 762 days, but the court's instructions permitted conviction even if the jury found a violation for a single day. The court imposed a fine for 762 days of violations, but the defendant argued that "the only violation the jury necessarily found was for one day, and imposing any fine greater than the single-day penalty of $50,000 would require factfinding by the court, in contravention" of *Apprendi*.

"[u]nlike a fine, which the district court retains discretion to reduce or eliminate, the district court has no discretion to reduce or eliminate mandatory criminal forfeiture . . . . Forfeiture is not a 'disguised fine' such that the rules applicable to fines apply equally to forfeiture." *Id.*

More generally, every Circuit to consider the question has found that *Apprendi* and its progeny did not alter the rule in *Libretti*, and *Southern Union* does not change that determination. The clear basis for the Supreme Court's holding in *Southern Union* was that Supreme Court case law "broadly prohibit[s] judicial factfinding that increases *maximum* criminal 'sentence[s],' 'penalties,' or 'punishment[s]' — terms that each undeniably embrace fines." *Southern Union*, 132 S. Ct. at 2351 (emphasis added) (citations omitted). The *Southern Union* Court explicitly held, however, that there could be no "*Apprendi* violation where no maximum is prescribed." *Id.* at 2353.

Although criminal forfeiture undoubtedly constitutes an element of punishment, *see Libretti*, 516 U.S. at 39, there is no statutory (or guideline) maximum limit on forfeitures. Rather, criminal forfeitures are indeterminate and open-ended, and may include all property "constituting, or derived from, any proceeds the person obtained, directly or indirectly," from his unlawful conduct. 21 U.S.C. § 853(a). The Second, Fourth, and Seventh Circuits have all explicitly distinguished *Booker* and denied the right to a jury determination in the forfeiture context because forfeiture is not a "determinate sentencing scheme" with a "statutory maximum." *Fruchter*, 411 F.3d at 383; *United States v.*

*Messino*, 382 F.3d 704, 713 (7th Cir. 2004); *United States v. Alamoudi*, 452 F.3d 310, 314 (4th Cir. 2006).[16]

As the Second Circuit explained in *Fruchter*:

> *Blakely* and *Booker* prohibit a judicial increase in punishment beyond a previously specified range; in criminal forfeiture, there is no such previously specified range. A judge cannot exceed his constitutional authority by imposing a punishment beyond the statutory maximum if there is no statutory maximum. Criminal forfeiture is, simply put, a different animal from determinate sentencing.

411 F.3d at 383. In fact, "*Booker* itself expressly states that" the section of the RICO statute that permits forfeiture (18 U.S.C. § 3554) "is still valid." *Fruchter*, 411 F.3d at 382 (quoting *Booker*, 543 U.S. at 258).

Turning to the statutory limits on forfeiture, Federal Rule of Criminal Procedure 32.2(b)(5)(A) states that a special jury verdict is available if the Government is seeking forfeiture of specific property; in that circumstance, the district court must determine whether either party wants the jury to determine the forfeitability of specific property. But this subsection

---

[16] The Third Circuit has also held that *Booker* did not upset the rule of *Libretti*. *United States v. Leahy*, 438 F.3d 328, 331–32 (3d Cir. 2006) ("even after *Booker*, the Sixth Amendment's trial by jury protection does not apply to forfeiture").

does not apply to the monetary forfeiture[17] sought by the Government in this case. *Newman*, 659 F.3d at 1242. With respect to monetary forfeitures, Federal Rule of Criminal Procedure 32 does not permit the district court to do anything other than "determine the amount of money that the defendant will be ordered to pay," in an amount determined by statute. *Id.* (quoting Fed. R. Civ. P. 32.2(b)). The statute states that a defendant must forfeit "a very specific amount – the proceeds of his criminal activity." *United States v. Casey,* 444 F.3d 1071, 1076 (9th Cir. 2006). Those proceeds need not be in the defendant's possession at the time of sentencing; in fact, imposition of forfeiture is still necessary even if defendant has no assets to forfeit. *Newman*, 659 F.3d at 1243. Normally, as in *Newman*, the broad definition of proceeds in this context will set the forfeiture amount as the amount that the defendant stole. *Newman*, 659 F.3d at 1243. Given that the only issue here was a monetary forfeiture, no jury determination was necessary.

Phillips also argues that he has already paid the stolen funds back to MOD and thus forfeiture cannot apply. But this argument confuses forfeiture and restitution. As we have previously explained, forfeiture and restitution serve entirely distinct purposes:

> Congress conceived of forfeiture as *punishment* for the commission of various [crimes]. The purpose of restitution . . . , however, is not to punish the defendant, but to *make the victim whole again* by restoring to

---

[17] Although the Government originally listed the watches for forfeiture, it did not seek forfeiture of the watches at sentencing.

>  him or her the value of the losses suffered as
>  a result of the defendant's crime.

*Id.* at 1241 (emphasis and alterations in original).

Therefore, Phillips is not entitled to credit for the amount that he repaid to MOD. Indeed, "[i]n the absence of a statute authorizing a reduction in forfeiture, the district court may not reduce forfeiture because of an order of restitution to a victim or because the victim already has been made whole." *Id.* There is no applicable statute here that authorizes such a reduction.

In sum, where the Government "disclaimed any intent to seek forfeiture of specific property," and sought only a money judgment, "there was no issue for the jury." *United States v. Gregoire*, 638 F.3d 962, 972 (8th Cir. 2011). Therefore, we remand for the district court to determine the amount of money that Phillips derived from the wire frauds charged in Counts 1, 2, and 3, and to enter a forfeiture judgment against Phillips for that amount.

For all the foregoing reasons, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings consistent with this opinion.